## JESSE ALBERTY v. STATE.

No. A-1963. Opinion Filed May 21, 1914.

(140 Pac. 1025.)

1. HOMICIDE—Insanity—Question for Jury. On a trial for murder, where evidence is introduced which in any degree tends to support the defense of insanity at the time of the commission of the homicide, the issue as to whether or not the defendant was then sane or insane is a question of fact for the jury to determine under proper instructions from the court.

2. CRIMINAL LAW—Criminal Responsibility—Capacity to Commit Crime. Section 2094 of the Penal Code provides: "All persons are capable of committing crimes, except those belonging to the following classes: * * * Fourth: Lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness."

Held that, under this provision, the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequences of such act.

3. HOMICIDE—Insanity—Burden of Proof. Section 5902 of Procedure Criminal provides: "Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

Held, that where the defense sought to be established is insanity, the legal presumption of sanity must be overcome by evidence which is sufficient to raise a reasonable doubt of the defendant's sanity at the time of the commission of the homicide. When that is done, the presumption of sanity ceases,

and the burden of establishing the sanity of the defendant is upon the state, which is then required to prove his sanity as an element necessary to constitute the crime, and if, upon consideration of all the evidence, together with all the legal presumptions applicable to the case, the jury have a reasonable doubt as to whether the defendant was mentally competent to distinguish between right and wrong, or to understand the nature of the act he was committing, he should be acquitted.

4.   **CONSTITUTIONAL LAW—Ex Post Facto Law—Punishment—Death Penalty—Change in Mode.** Chapter 113, Laws 1913, prescribes ''the punishment of death must be inflicted by electrocution,'' and substitutes the penitentiary for the county jail as the place where a judgment of death must be executed, and requires the court to appoint a day for the execution, not less than 60, nor more than 90 days from the time of the judgment. The former statute required the court to appoint a day for the execution, not less than 30, nor more than 60, days from the time of the judgment; the punishment of death to be by hanging, or by electrocution, as the trial court might order.

Held that the changes effected by the later law relate solely to penal administration, and it was within the power of the Legislature to make them applicable to offenses committed prior to its enactment. The extension of the time within which the execution may take place after sentence is a mitigation, and not an increase, of punishment, and does not render the act ex post facto, and substituting the penitentiary for the county jail as the place where the judgment of death must be executed is not ex post facto, when applied to a person convicted of a murder committed before its enactment.

5.   **JUDGMENT—Vacation—Repeal of Statute.** Under the constitutional saving clause, providing that ''the repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repeated statute'' (article 5, sec. 54; section 144, Williams'), the repeal of the amendment of a statute prescribing the punishment for an offense after final judgment has been pronounced, and while an appeal therefrom is pending, does not in any respect vacate or modify such judgment, nor arrest the execution of the sentence, where the judgment is affirmed.

*Appeal from District Court, Wagoner County;*
*R. P. de Graffenried, Judge.*

Jesse Alberty was convicted of murder, and appeals. Affirmed.

Plaintiff in error, herein referred to as the defendant, was convicted in the district court of Wagoner county upon an information for murder, and was awarded the death penalty by the jury. In accordance with the verdict, on February 19, 1913,

the court rendered judgment, and sentenced the defendant to be hanged. To reverse the judgment, an appeal was perfected.

The count of the information on which the defendant was tried and convicted charges that the defendant, Jesse Alberty, did, in Wagoner county, on or about the 24th day of October, 1912, unlawfully and feloniously, and without authority of law, and while acting in a manner imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, did shoot and discharge certain leaden bullets into the body of one William Markham, from a certain loaded shotgun which the said Jesse Alberty then and there had and held in his hands, then and there and thereby inflicting upon the body of him (the said William Markham) a mortal wound, from which the said William Markham then and there did die.

The evidence shows that the defendant was about 21 years of age, and that the deceased was about ten years of age; that on the night of the tragedy all the parties concerned attended a supper given at a schoolhouse in the neighborhood.

Cora Markham testified: That she was in attendance at that supper with her children, Clarence, Legus, Callie, Clementine, and Willie, the deceased. That about midnight they started home, her two daughters in a buggy with her and her three sons in another buggy. When about half a mile from the schoolhouse, the defendant and John Scrimsher rode past them on horseback, going towards the defendant's home, which was about three miles from the schoolhouse; her home being less than a mile beyond. After passing the defendant's house, she heard somebody say, "Whoa! whoa! hold up there, God damn you; I am going to kill every God damn one of you;" and she stopped her buggy to see who it was. That she saw the defendant with a shotgun, and he fired one shot. That she asked her sons whom did he shoot, and they said he shot Willie. That she jumped out of the buggy and ran towards the defendant, begging him not to shoot. The defendant was on a horse, and he said, "I am going to kill the damn son of bitches," and she continued begging him not to. That her son Legus took the little boy and laid him on

the ground, and the defendant said, "God damn you, I will just kill you too and be done with it," and rode up and threw the gun down on Legus, and she begged him not to kill her children. That he wheeled away from Legus, and chased Clarence around the buggy two or three times. That he then turned to Legus and said: "Hold up, God damn you; I know what you want. You want to go to the house and get your damn gun, and if you don't come back I will blow the top of your head off. Don't you run; if you do, I will kill you." And she said to him: "Jess, don't do that; you have done enough; you go on off." That about that time John Scrimsher walked up to him and asked him what he had done. Legus said he had shot Willie. That he was riding John Scrimsher's horse, and John Scrimsher said, "What did you take my horse and run off with it for?" and he got off of the horse, and Scrimsher said to him, "Jess, come and look and see what you have done," and they went to where the little boy was lying, and when defendant looked at the little boy he said to witness, "Go and get a doctor; I will pay the doctor's bill; I am able to pay it;" and she said to him, "Jess, you come and go with me to your house; I can't use my phone;" and he said, "All right;" and he walked with her a quarter of a mile to his house, and she went in and phoned for a doctor, and he said to her when she was leaving, "You tell them damn son of bitches not to follow me; if they do, I will kill the first one that shows up." That it was a moonlight night. That the shooting took place in Wagoner county, Okla.

The testimony of Callie Markham and Clementine Markham as to the facts of the homicide was, in substance, the same as that of their mother.

Legus Markham testified that he was eighteen years old; that before they left the schoolhouse, the defendant and witness' brother Clarence had a scuffle, and they clinched and fell, and Pen Anderson pulled Clarence off, and he caught the defendant and said, "You boys must stop that," and they all shook hands. As to the circumstances of the shooting, his testimony was the same as that of his mother.

Clarence Markham testified: That when they were all getting ready to start home the defendant walked up and hit him, and then two or three licks passed, and they clinched, and he threw the defendant. That his brother Legus walked up and pulled him off. Pen Anderson came up and said: "There was no need of that." The defendant said, "Boys, we are all as good friends as ever;" and witness and his brothers got into the buggy and started home, following their mother and sisters, who were in another buggy. That when Willie was shot he was sitting in Legus' lap in the buggy. His further testimony as to the facts and circumstances of the homicide was the same as that of his mother.

Sam Manuel testified: That he lived at the defendant's house. That at about midnight the defendant came in and lit a lamp and handed it to John Scrimsher to hold. That he then went and got his double-barrelled shotgun and his father's gun. He then took the loads out of his father's gun and put the loads in his own gun. He then said, "I am ready to go home with you," and they went out. That a little later he and Mrs. Markham came back together.

Dr. C. R. Gordon testified that he was called to see the Markham boy about 2 o'clock in the morning, and found him in a dying condition; that his right arm was almost severed from his body, and some shots were in his right side; that he lived about an hour, and died from the effects of gunshot wounds. The state rested.

On behalf of the defendant, Noah Alberty testified: That the defendant was his son, and had always lived with him. That he was acquainted with his disposition and habits, and had noticed his peculiar actions and conditions since early childhood. That the same condition existed now. These peculiar actions consisted in this: That he was very unruly, not all of the time, but just at times; that such condition did not come as the result of any action on the part of witness. He would get contrary, and witness could not do anything with him. He would want to fight, or something of that kind. When he was about fifteen he seemed to grow worse. That witness would sometimes tell him to go to work, or something of that kind, and he would want to fight witness, or be

saucy to him, or something of that kind. That he was unruly about stock. That when he would drink it would make him worse. That on the day that Willie Markham was killed witness met his son in Wagoner, and he had been drinking some, but was very quiet. That he was acting kind of stubborn that night, and didn't have anything to say to anybody, and refused to talk to witness. That witness had used liquor in one form or another all his life, and "had drunk right smart prior to the birth of this boy." That defendant's mother had "spells" once in a while, and would get unruly, and she would want to fight. That his wife's mother would have the same kind of "spells." That his first wife's sister was subject to those "spells," and she kept getting worse until she went crazy, and prior to statehood she was in an insane asylum for the colored, located at Tahlequah.

On cross-examination, he stated that he would not say that his first wife, the defendant's mother, was insane; and that the defendant would loaf around and drink whisky with the boys.

Mary Alberty testified that she was the stepmother of the defendant; had been married to his father about ten years; that in those "spells," the defendant acted like somebody that is losing his mind; that he wants to fight, and at one time he offered to fight his father.

Pleas Alexander testified that he knew the defendant's mother's sister, and that she was crazy, or something was wrong with her; that he saw her three or four times when she acted as though she was crazy.

Warren W. Phelan testified that he had taught psychology for the past ten years, and at the present time was a teacher of psychology in the State University at Norman; that he was acquainted with and knew the phases of insanity; that, of the several names applied to different forms of insanity, mania was the most common; that *dementia praecox* was "manifested first from the age of ten up to 24, and the difference, that is the name given to mania, or insanity, to distinguish it for instance from *paranoia,* which does not come until later in life; that *paranoia* is more of a continuous growing condition, while *dementia praecox* is off and on. It has heightening periods and receding periods, and it

might happen every month, or might be, say three or four months apart, or maybe longer; there is no set rule."

His further testimony, as shown by the transcript, is as follows:

"Q. In the case at issue, the testimony in the case shows that this defendant has suffered since childhood with peculiar spells ranging from a week to a month, sometimes longer between these spells; that during that time he was violent, with a tendency to injure both man and beast; that during the time he was not under one of these spells, or in one of these spells, that he was quiet, manageable, and peaceable; that the mother of this boy suffered the same peculiar condition; that the grandmother of this boy was subject to the same conditions of the mind; that the sister of this boy's mother is now insane, or was four or five years ago, the evidence shows. Now, under that state of facts, would it be possible for this boy to have inherited these or this condition of the mind? A. Yes; all the authorities say so. The statement given out by all the experts in the insane asylums and most all the literature of insanity makes this statement: That where there is a father and mother that were imbecile, demented, or insane, both of them, they would in all probability have insane offspring. When either father or mother alone, followed by the grandmother, and also the—in the case you have just stated the sister, that makes it even more certain that the offspring will be insane, more even than when it is just the two parents, because it follows a general scheme or theory that has been proved by the insane asylum experts, a theory by the name of Mendelism, and that theory would say that, where just the father and mother were insane, their inheritance might have been very slight, coming down from a great number of generations, but, when for two generations before the offspring in question insanity has been fully demonstrated even on one side, as in the case you state, why then they say absolutely, actually, as a fact, that the offspring will always be insane or imbecile or demented."

Cross-examination:

"Q. Professor, are you a member of the school of heredity or of environment in regard to insanity? A. I should say of heredity. Q. In other words, then, there are two theories with regard to insanity, one of environment, and the other of heredity? A. There are two theories, but that of environment is pretty well exploded. Q. And the one of heredity does not always work

out? A. Those of us who believe in the theory of heredity claim that it does. Q. I presume that on the other hand those who believe in the theory of environment claim the same thing? A. I suspect they might, but they are in the minority."

He further stated that he had not examined defendant, and had not put any of the ordinary tests for insanity either to the defendant, his grandmother, or his mother's sister; that he based his answers solely on the facts stated in the hypothetical questions.

The defendant, Jesse Alberty, took the stand as a witness in his own behalf. After stating his name, he was asked and answered but one question, as follows:

"Q. Jesse, did you know what you were doing the night Willie Markham was shot? A. No, sir."

On cross-examination, he stated that:

"The last I remembered was at the schoolhouse; I remember some few who were there; I didn't know what I was doing; I just remember when the last 'spell' was; I have been that way off and on all my life; I have been in jail three months; I haven't had any 'spells' since I have been in jail; I don't remember getting the shotgun, nor going off on John Scrimsher's horse, or going down and shooting; I don't remember anything until the next morning; I was laying there asleep, and my mother woke me up and asked me if I knew what I had done. This was about 7 or 8 o'clock; went to my grandmother's and stayed there a day or two."

The foregoing is a substantial statement of all the evidence introduced upon the trial.

*Joseph S. Dickey, Jr.,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *C. J. Davenport,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). There is no dispute as to the facts and circumstances of the homicide. The theory of the defense was excusable homicide on the ground of insanity, and the sole question presented on this appeal arises upon the refusal of the court to give the following instruction:

"You are instructed that the law presumes that every person is sane, and it is not necessary for the state to introduce

evidence of sanity in the first instance. When, however, any evidence has been introduced tending to prove insanity of an accused, the burden is then upon the state to establish the fact of the accused's sanity, the same as any other material fact to be established by the state to warrant a conviction. If the testimony introduced in this case tending to prove that the defendant was insane at the time of the alleged killing of Willie Markham raises in your mind a reasonable doubt of his sanity, at the time of the alleged crime, then your verdict should be acquittal."

The court refused to give this instruction, and the defendant excepted. No objection was made or exception taken to the instructions given by the court.

The defendant's counsel contends that, under the rule declared by this court in the case of *Adair v. State,* 6 Okla. Cr. 284, 118 Pac. 416, 44 L. R. A. (N. S.) 119, the refusal of the court to give the instruction requested constitutes reversible error. We think the contention is manifestly without merit.

Section 2094 of the Penal Code (Rev. Laws 1910) provides:

"All persons are capable of committing crimes, except those belonging to the following classes: * * * Fourth: Lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness."

Under this provision the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has the mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequences of such act.

In the course of the opinion in the Adair case, *supra,* it is said:

"It is immaterial what standard scientists or medical experts may fix to determine, or by what rules they determine that a person is in a state of insanity; the accused under this provision of the law is a lunatic, or insane, or of unsound mind, or temporarily or partially deprived of reason, to such an extent as will excuse him from criminal responsibility, only when he is incapable of knowing the wrongfulness of the act committed and charged, and incapable of understanding the nature and conse-

quences of such act, and this is a question of fact for the jury to determine under all the evidence in the case."

Section 5902, Procedure Criminal (Rev. Laws 1910), provides:

"Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

In the Adair case, it is said:

"Under the statute, the rule as to the burden of proof in a homicide case, when the defense of insanity is interposed, we hold to be this: The defendant is presumed in law to be sane and capable of knowing right from wrong as to the homicidal act, and to understand the nature and consequences of such act, and, unless the proof on the part of the prosecution is sufficient to raise a reasonable doubt of the defendant's sanity, the burden is upon the defendant, in the first instance, to overcome this presumption by introducing sufficient evidence to raise a reasonable doubt of his sanity when the act was committed. When he has done this, the prosecution, in order to convict, must prove the defendant's sanity beyond a reasonable doubt; and if, on a consideration of all the evidence, the jury entertain a reasonable doubt as to the defendant's sanity when the act was committed, he should be acquitted."

Upon a trial for murder, the presumption of innocence has been overcome when the commission of the homicide by the defendant is proven beyond a reasonable doubt; a presumption of guilt then obtains, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable. Thereupon, under this section of the statute (section 5902, *supra*), the burden of introducing sufficient evidence to raise a reasonable doubt of his guilt is upon the defendant. When he has done this, the burden of proof is upon the state to establish the guilt of the defendant beyond a reasonable doubt. Every defendant is presumed in law to be sane and capable of knowing right from wrong, and able to choose between them. This presumption, however, upon a trial for murder, is overcome when-

ever evidence is adduced sufficient to raise a reasonable doubt of the defendant's sanity at the time of the commission of the homicide. The law thereupon imposes upon the state the burden of establishing the sanity of the defendant the same as any other material fact necessary to warrant a conviction; that is, beyond a reasonable doubt.

In instruction No. 5 the court stated the defense of insanity, and quoted the language of the fourth subdivision of section 2094, *supra*.

Instructions Nos. 6 and 7, as given by the court, read as follows:

"VI. You are therefore instructed that, if you believe from the evidence in this case that the defendant shot and killed the deceased in manner and form as charged in the information, and you further believe that the defendant at the time of the killing was a lunatic, or an insane person, or was a person of unsound mind, or was temporarily or partially deprived of his reason, to such an extent that he was incapable of knowing the wrongfulness of his act, then it will be your duty to acquit the defendant, and you are instructed that, if you acquit the defendant on the ground of insanity, you should state that fact in your verdict.

"VII. You are further instructed in this connection that if, after a full and careful consideration of the whole case, you entertain a reasonable doubt as to the sanity of the defendant, at the time that he fired the fatal shot, you will then give him the benefit of such doubt and return a verdict of not guilty."

It will be observed that, as to the burden of proof, the requested instruction is *when any evidence has been introduced tending to prove insanity*. In the Adair case, it was held that by the express provision of the statute (section 5902, *supra*), when the commission of the homicide is admitted or proven, and the defense sought to be established is the insanity of the defendant, the legal presumption of sanity must be overcome *by evidence which is sufficient to raise a reasonable doubt of the defendant's sanity at the time of the killing*. When that is done, the presumption of sanity ceases, and the burden of establishing the sanity of the defendant is upon the state, which is then required to prove his sanity as an element necessary to constitute the crime, and if, upon consideration of all the evidence,

together with all the legal presumptions applicable to the case, the jury have a reasonable doubt as to whether the defendant, at the time of the commission of the homicide, was mentally competent to distinguish between right and wrong, or to understand the nature of the act he was committing, he must be acquitted.

The defense of insanity, or at least the existence of such mental disturbance or derangement of the mind as to render the defendant irresponsible in law for the act committed, rested largely, if not entirely, upon the testimony of his father that the defendant was subject to "spells," at which times he was very unruly, and would want to fight, and that his mother was afflicted in like manner, and that the defendant's mother's sister was insane at one time. It was not claimed that the defendant was subject to fits of epilepsy, or that he was a person of feeble mind. The evidence shows that the defendant was born and had lived all his life in that neighborhood; yet no testimony was introduced to show that he had ever acted irrationally.

The expert who testified did not confine his answer to the facts as stated in the hypothetical question, but stated generally "that, where there is a father and mother that were imbecile, demented, or insane, both of them, they would in all probability have insane offspring," and, "when for two generations before the offspring in question insanity has been fully demonstrated even on one side, the offspring will always be insane or imbecile or demented." The proof in this case did not establish or tend to establish any such facts.

It is proper to say that, after a careful examination of all the testimony in regard to the mental condition of the defendant at the time of the homicide, it does not fairly permit any other conclusion than that the shooting was the willful, deliberate, and premeditated act of a person who understood perfectly well the nature and consequences of his act.

The defense of irresponsibility, at best, presents a question of fact for the jury, and when they have settled that question without passion or prejudice, in accordance with the evidence, it is not the province of this court to disturb the verdict of the jury. We think that the charge to the jury was as favorable

to the defense as the law permitted, and, for the reasons stated, the instruction requested was properly refused.

We have given the case that careful consideration which its importance and its solemn consequences to the defendant demand, and we see no occasion to interfere with the execution of the judgment of death. The defendant has had a fair trial, and has been convicted upon evidence which should satisfy the fairest mind of his guilt. The judgment is therefore affirmed.

It appears from the record that after the judgment was rendered and sentence of death was pronounced the law approved March 29, 1913, regulating the infliction of the death penalty, was passed. The statutes in force when the judgment was rendered provided:

Section 5967, Rev. Laws 1910:

"When judgment of death is rendered, the judge must sign and deliver to the sheriff of the county, a warrant duly attested by the clerk, under the seal of the court, stating the conviction and judgment, and appointing a day on which the judgment is to be executed, which must not be less than thirty nor more than sixty days from the time of the judgment."

Section 5981, Rev. Laws 1910:

"The punishment of death must be inflicted by hanging the defendant by the neck until he is dead; or his life may, under the direction of the Governor, and at the cost of the state, be taken by electricity if the court so orders."

Section 5982, Rev. Laws 1910:

"A judgment of death must be executed within the walls or yards of a jail of the county in which the conviction was had, or some convenient private place in the county. If there is no such jail or prison in the county in which the conviction was had, or if it becomes unfit or unsafe for the confinement of prisoners, or is destroyed by fire or otherwise, and the jail of another county has been legally designated for the confinement of the prisoners of the county in which the conviction was had, the judgment must be executed in manner as above."

By sections 1, 2, and 9 of chapter 113, Sess. Laws. 1913, it is provided:

"Section 1. The punishment of death must be inflicted by electrocution.

"Section 2. When judgment of death is rendered the judge must sign and deliver to the sheriff of the county a warrant duly attested by the clerk, under the seal of the court, stating the conviction and judgment and appointing a day on which the judgment is to be executed, which must. not be less than sixty nor more than ninety days from the time of the judgment and must direct the sheriff to deliver the defendant within ten days from the time of judgment to the warden of the state prison at McAlester, in this state, for execution."

"Section 9. A judgment of death must be executed within the walls of the state prison at McAlester, Oklahoma, said prison to be designated by the court by which judgment is to be rendered."

The act of 1913 took effect June 15, 1913. It will be observed that it differs from the statute in force when the judgment and sentence of death was rendered in the following particulars: Chapter 113, Sess. Laws 1913, prescribes, "The punishment of death must be inflicted by electrocution," and substitutes the penitentiary for the county jail as the place where a judgment of death must be executed, and requires the court to appoint a day for the execution not less than 60, nor more than 90, days from the time of the judgment. The former statute required the court to appoint a day for the execution not less than 30, nor more than 60, days from the time of the judgment; the punishment of death to be by hanging, or by electrocution, as the trial court might order.

We are of opinion that the provisions of chapter 113, Sess. Laws 1913, applied to crimes committed prior to the time said act took effect, and are not repugnant to the provision of the federal Constitution declaring that no state shall pass an *ex post facto* law. Article 1, sec. 10, Const. U. S. It did not create a new offense, nor require the infliction of a greater or more severe punishment than the law annexed to the crime when committed. The changes effected related solely to penal administration. The act changed the place and the officer for carrying out the sentence of death, and the extension of the time within which the execution may take place after sentence is a mitigation, and not an increase, of punishment. Our conclusion is based upon the holding of the Supreme Court of the United States in the case of

*Rooney v. North Dakota,* 196 U. S. 319, 25 Sup. Ct. 264, 49 L. Ed. 494, 3 Ann. Cas. 76, wherein it was held that:

"A state statute changing the punishment for murder in the first degree by substituting close confinement in the penitentiary for not less than six nor more than nine months for confinement in the county jail for not less than three nor more than six months after judgment and before execution, and by substituting hanging within an inclosure at the penitentiary by the warden or his deputy for hanging by the sheriff within the yard of the county jail, is not *ex post facto,* and therefore unconstitutional, when applied to a person convicted before its enactment."

In the course of the opinion it is said:

"The objection that the later law required the execution of the sentence of death to take place within the limits of the penitentiary rather than in the county jail, as provided in the previous statute, is without merit. However material the place of confinement may be in case of some crimes not involving life, the place of execution, when the punishment is death, within the limits of the state, is of no particular consequence to the criminal. On such a matter he is not entitled to be heard."

In *Henry v. State, ante,* 136 Pac. 982, this court held that chapter 113, Sess. Laws 1913, was not an *ex post facto* law, within the inhibition of the state Constitution (section 15, Bill of Rights), when applied to a person convicted and sentenced before its enactment, where an appeal therefrom was pending at the time the act took effect.

The judgment and sentence in this case was rendered under the statute in force at the time of the homicide for which the defendant was convicted, and an appeal therefrom was pending when the act of 1913 took effect. It is apparent that the Legislature intended that the provisions of the act of 1913 should control in the rendition and execution of judgments of death in all cases wherein such judgments should be rendered after the act took effect, including cases where the murder had been committed prior thereto. However, no provision was made for cases pending on appeal where the judgment and sentence was death by hanging, if there should be an affirmance of such a judgment. In such cases we think the effect of the act of 1913 after final

judgment should be determined by reference to the constitutional saving clause which provides:

"The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute." (Article 5, sec. 54; article 144, Williams'.)

Under this constitutional provision, the Legislature cannot intervene and vacate or modify the judgment of the courts either directly or indirectly by repeal or by amendment of a statute under which the judgment was rendered (*Lilly v. State,* 7 Okla. Cr. 284, 123 Pac. 575), and on principle it would be an exercise of judicial, and not of legislative, power.

"Legislative action cannot be made to retroact upon past controversies, and to reverse decisions which the courts, in the exercise of their undoubted authority, have made; for this would not only be the exercise of judicial power, but it would be its exercise in the most objectionable and offensive form, since the Legislature would, in effect, sit as a court of review to which parties might appeal when dissatisfied with the rulings of the courts." (Cooley, Const. Lim. [7th Ed.] 136.)

The repeal or the amendment of a statute prescribing the punishment for an offense after final judgment has been pronounced and while an appeal therefrom is pending, will neither vacate nor modify such judgment, nor arrest the execution of the sentence when there is an affirmance of the judgment and sentence. This conclusion is to some extent opposed to that reached by this court in *Henry v. State, supra;* but, as the ground of our decision herein was not discussed nor at all considered in that case, it cannot be regarded as a binding precedent, and since Henry's sentence was by the chief executive commuted to life imprisonment, no right could be or was injured thereby.

As the day fixed for the execution of the judgment has passed, the cause is remanded to the trial court with directions to proceed under the provisions of Procedure Criminal (sections 5979 and 5980, Rev. Laws 1910), prescribing the procedure when a judgment of death has not been executed on the day appointed. When the defendant is brought before the court, if he should elect or request to have the judgment and sentence modified to conform to the provisions of the act of 1913, in order to avoid

any possible question, the court is directed to modify said judgment in conformity to the provisions of said act. Otherwise the trial court is directed to fix another day for the execution of the judgment and sentence as set forth in the death warrant issued upon the judgment and sentence. The warden of the penitentiary is directed to deliver the defendant, Jesse Alberty, to the sheriff of Wagoner county, who is directed to safely keep the defendant in custody pending the proceedings in the trial court.

ARMSTRONG, P. J., and FURMAN, J., concur.