## JOHN BUXTON v. STATE.

No. A-2005.    Opinion Filed September 22, 1914.

(143 Pac. 58.)

1.     **APPEAL—Continuance.** A motion for continuance, on the ground of absent witnesses, is addressed to the discretion of the trial court, and its decision will not be disturbed, unless an abuse of discretion appears.

2.     **CONTINUANCE—Discretion.** It is no abuse of discretion to overrule a motion for continuance, where no diligence is shown to procure the attendance of, or take the deposition of, a nonresident witness.

3.     **APPEAL—Harmless Error—Challenge to Jury Panel.** A challenge to the panel on the ground that, in selecting the jury list, "the jury commissioners failed to select the list of jurors from the various municipal townships in the county in proportion to the

voting strength of such townships'' is insufficient, unless it is shown that the irregularities were such that the defendant has suffered material prejudice.    Procedure Criminal (section 5842, Rev. Laws 1910).

4.     **WITNESSES—Cross-Examination of Accused.**    A defendant, by availing himself of the statutory privilege of becoming a witness, has voluntarily changed his status from defendant to witness, and thereby waives his constitutional exemption from being a witness against himself, and places himself in the attitude of any other witness in respect to the right of cross-examination.

5.     **SAME—Accused as Witness—Scope of Examination.**    Under section 5881, Rev. Laws 1910, providing that, in criminal proceedings, ''the person charged shall at his own request, but not otherwise, be a competent witness,'' a codefendant is competent as a witness for all purposes, where he requests to be a witness in his own behalf.    It does not matter whether his testimony is for or against himself, or for or against his codefendant; the only limitation in the statute is that he cannot be compelled to testify either for himself, his codefendant, or for the state while he is a party in the case.

6.     **TRIAL—Witnesses—Submission of Issues—Guilt of Codefendant.**    Under section 5880, Rev. Laws 1910, providing that ''when two or more persons are included in the same indictment or information, and the court is of opinion that in regard to a particular defendant there is not sufficient evidence to put him on his defense, it must, before the evidence is closed, in order that he may be compelled to be a witness for his codefendant, submit its opinion to the jury, who, if they so find, may acquit the particular defendant for the purpose aforesaid,'' **held,** that where the record fails to show that a defendant seasonably announced that he intends to use his codefendant as a witness, and where the record shows that such codefendant testified as a voluntary witness in his behalf, the omission of the court to separately submit to the jury its opinion that, in regard to said codefendant, there is not sufficient evidence to put him on his defense does not constitute prejudicial error.

7.     **HOMICIDE—Murder—Sufficiency of Evidence.**    See opinion, for statement of evidence **held** sufficient to support a capital conviction for murder.

(Syllabus by the Court.)

*Appeal from District Court, Choctaw County;*
*Summers Hardy, Judge.*

John Buxton was convicted of murder, and appeals.    Affirmed.

*S. M. Cunningham,* and *Wiygul & McClary,* for plaintiff in error.

*C. J. Davenport,* Asst. Atty. Gen., for the State.

DOYLE, J. This appeal is prosecuted from a conviction had in the district court of Choctaw county, in which John Buxton, plaintiff in error, was found guilty of murder, and his punishment assessed at death. The information on which plaintiff in error was tried and convicted jointly charged that plaintiff in error, John Buxton, and one A. F. Buxton did in Choctaw county, and state of Oklahoma, on or about the 18th day of July, 1912, kill and murder one Sloan Pool. Upon their trial the jury returned a verdict which reads as follows:

"We, the jury, duly impaneled and sworn in the above-entitled cause, do upon our oaths find the above-named de-defendant John Buxton guilty of murder as charged in the information herein, and assess his punishment at death, and find the defendant A. F. Buxton not guilty."

The verdict was rendered November 21, 1912. On the 27th day of November, 1912, in accordance with the verdict, the court pronounced judgment, and he was sentenced to be hanged. An appeal was perfected by filing in this court May 22, 1913, a petition in error with case-made.

There were but three eyewitnesses to the homicide: Jess Allen and the two defendants. A substantial statement of the testimony in the case is as follows:

Jess Allen testified that he lived at the time at the home of A. F. Buxton, the father of the defendant John Buxton. Sloan Pool, the deceased, together with witness and old man Buxton, scaled logs in the forenoon. After dinner they returned, and on the way the defendant John Buxton joined the three. They first scaled witness' logs and old man Buxton's logs; and they then scaled the defendant John Buxton's logs. As to what happened thereafter the witness testified as follows:

"We was all sitting there on a log, and John asked me how many logs I believed he had in the mill yard, and I had them all set down together in the book I had, and I couldn't tell; I was sitting between him and Mr. Pool, and Mr. Pool sat down on the log to show John how many logs was in the mill yard. Mr. Pool was showing him in his book and pointing out to me

that I had them all.   Mr. Pool showed John that there was all the logs set down, and John said, 'I don't want them to be like the last month's pay day,' or 'settlement.'   I forget which, and Mr. Pool asked him how was that, and he said, 'You figured me out of 7½,' I believe.   Said he never done it.   John said he did, and Mr. Pool said he didn't, and John called him a damn liar, and Mr. Pool disputed his word, and John asked him if he meant to dispute his word, and Mr. Pool said, 'Yes, in that way I mean to dispute your word.'   I heard something snap like a gun, and I raised my head, and about that time John shot him.   When he started to shoot, Mr. Pool was sitting between him and me.   I got up and walked plumb around the other side of old man Buxton, by John, and he done quit shooting.   The second shot John fired, Mr. Pool fell.   Mr. Pool was hit five times; he had five bullet holes in him.   When he shot Mr. Pool, Mr. Pool had a scale stick in his right hand and book, and after he fell, if he said a word, I didn't hear him.· After Mr. Pool was dead, John walked right up at him and said, 'You God damn son of a bitch, the next log you scale will be in hell,' and shot him again.   He was right up over him; right up at him when he fired the last shot.   After the shooting John says, 'Let me see if he still holds this knife,' and run his hand in Mr. Pool's left pocket, and I walked down the road, and after I got about twenty steps John told me to come back, and I went back.   John had the knife in his left hand and the gun in his right hand, and he asked me, says: 'Now, by God, how are you going to swear about this?'   I studied a minute, and I says: 'I don't know, John.   I guess I will have to swear the truth.'   And he said I didn't have to do any such a God damn thing.   I said if I didn't, I wouldn't.   He said, 'Well, I guess I will have to whittle on myself,' and he took the knife and cut himself down here and there (indicating), and made three or four gashes on his arm.   Then John reached over Mr. Pool and stuck his knife in his hand, and we walked down toward the mill.   After John shot Mr. Pool, Mr. Buxton, his father, says, 'John, where you done wrong is shooting him so many times,' and John says, 'Oh, hell.'"

Witness further testified that defendant was about eight or ten feet from Pool when defendant began to shoot; that he heard defendant tell old man Buxton one day "that he might take his six-shooter and make Mr. Pool write him a check just as big as he wanted it at the muzzle of his six-shooter."

On cross-examination he testified: That he was 26 years old; had lived in that county twelve or thirteen years; had been farming, became acquainted with Buxtons about six months before the killing; had been living at the elder Buxton's about a month. That John and old man Buxton had been cutting logs on the same twenty acres of land. That witness had never been a witness before in any case. That, when John and Mr. Pool began quarreling, old man Buxton asked them "to come on and let's get through scaling logs." That, when John commenced to shoot, old man Buxton was ten or twelve feet away. That witness was further away. That, about the time witness raised his head, John shot. The first two shots were about as fast as he could shoot. He further testified, as on direct examination, as to defendant cutting himself; further that witness was arrested; that when Mr. Pool fell he had a book in one hand and a scaling stick in the other; that, when defendant shot, Mr. Pool had his hands down by his side. He further testified that he knew Mrs. Ruth Holden, daughter of Mr. Buxton; that he had been with her since the killing, took her driving; denied that the officers threatened to put him under bond if he did not quit going with her; that he did not tell her that he had sworn falsely against her father and brother and was sorry.

On redirect examination he testified: That he had never at any time or place said to her that he had sworn falsely against her father or brother. That the shooting occurred in "this county and state," near Frogville. That defendant shot Mr. Pool with a 32 Colt's revolver, which witness had let defendant have about a month or longer before. That he was keeping the check on the scaling. That after the shooting he and old man Buxton went back north and west to the mill. Defendant went about halfway, and then turned back south, went off whistling that old song "Chicken"; went towards his home. When witness returned, there was a crowd at the body. That after the shooting he made a statement as to the shooting to Tom Capps. That old man Buxton was telling them about Mr. Pool cutting John. That, before John left witness

and old man Buxton, "He said me and old man would have plenty of time to talk it over so we could both tell it alike."

G. A. Turnbow testified: That he lived on July 18th near Frogville; had known Mr. Pool about two months. After the killing he saw Mr. Pool's body in the road about 180 steps from his house; examined the body, and found five wounds, one on right shoulder, one in left hip, one in the head, and two other wounds. The bullet which entered the hip ranged up. The one in the right shoulder ranged up a little bit. The one in the left side ranged up a ways, and struck a rib. One bullet lodged between the shoulders. The one bullet entered the head right behind the ear. One bullet hole was in the left trouser's leg; didn't touch the leg. The bullet which entered the head powder-burned; saw no other powder burns. Six bullets struck the body and clothing. That the first ones who reached the body were the three men who lived in Texas: Mr. Johns, Mr. Gears, and Mr. Reasnor. That in the relaxed fingers was a pocket knife. That he saw defendant pass through his lot and yard about 30 minutes before the shooting. There were five shots in quick succession, and just a little bit elapsed, and a sixth shot. Mr. Johns came and told him about the man being killed. He went there and noticed the scaling stick and book and pencil "lying tolerable close" to his feet; also found six cartridge hulls lying there right close to his head. His pipe was lying close to his mouth. He examined the knife. There was a little bit of blood on the edge and point.

H. L. Johns testified: That he lived at Blossom, Tex. On the day of the shooting he had been at Everedge Lake, fishing. As he was going home, he ran across the body of Mr. Pool, lying on his right shoulder with one hand a little in front of his face with a knife in his hand. His hand was relaxed; the knife sticking in it. Discovered a little blood on the end of the knife. The head was powder-burned. One wound was about his right shoulder. Saw daybook and pencil and scaling stick near him. There was one track which went down the road south fifteen or twenty steps and turned around and came right back to the body. Saw the pipe. Saw a man count the cartridges that

were picked up. The pencil, book, and scaling stick were a little bit south from the body.

## The Defense.

A. F. Buxton testified that he was 51 years old; father of defendant John Buxton; lived in Oklahoma twelve years, with exception of a few months; lived near Lawton; has five children; never been arrested for any offense prior to this. As to the facts leading up to and including the killing, this witness testified:

"We walked something like twelve or fifteen steps, and we come to this crooked pole of a log that laid along side of the road where the wagons run, and I was in front, and Mr. Pool started to sit down on it, and I says: 'Mr. Pool, don't sit down; let's go on and finish up scaling the logs; we havn't got but a few.' He says: 'I am hot and tired, and I am going to rest.' He set down on the log, and Johnny on the other side, and Jess Allen on the other side of John, and I walked up and set down side of Mr. Pool. And Mr. Pool got his book out, or rather had it in his hands; I don't remember whether he hadn't put it in his pocket, but any way he went to looking at his book, and John says to Jess Allen, says, 'Where's our book?' and Jess handed it to him. He got up and come around and sat down on his hunkers kinda between John and Mr. Pool, and he looked at it a minute, and he couldn't understand the way Jess had set down the logs. He never had set any logs down—a botched up way. I never had it in my hands. Jess went on to show how he set the logs down, and they talked on there a few minutes, and they begin to quarrel over the scaling of the logs, and I says, 'Men,' I says, 'Don't go to quarreling over these logs.' I says, 'Let's go on and finish scaling these logs.' I says, 'Stop it right now, and let's go on and finish scaling these and get through with it; we have just a few above the mill, and we will be done and get settled up, and maybe everything will work out all right.' And Mr. Pool says, 'I am going to scale every log from start to finish, and what was on the yard and all, from start to finish.' Johnny says, 'You are not going to scale my logs I have been settled for; in the month before this,' he says, 'I cut to the amount of something over 14,000 feet (I don't remember the amount) at two dollars and a half a thousand, and something over 9,000 feet at six bits a thousand, and was paid to the amount of $44.60 for them; settled up full.' Mr. Pool says, 'I am going to scale every log

from start to finish;' and he says, 'You never cut any such damned amount, and I am not going to pay you a damned cent, only what my books shows for.' John says, 'You are a damned liar;' and Mr. Pool says, 'God damn you, you think you can run something over somebody;' and he had his scale stick and book and pencil in his left hand and knife in his right hand. He had his knife out before he got off the log sharpening his pencil, and still had it in his hand and started at Johnny, and cut at him three or four times with his knife, and Johnny run back three or four steps, and was pulling his gun out, and Pool discovered him pulling his gun and stopped, and John commenced shooting, and fired, as nigh as I could tell. It was just like that until every shot was fired (indicating). I throwed up my hands. I stood there in the road when I was talking to him about going to scale the logs and scraped a place in the road with my foot. I just throwed my hand up that way, watching them, because they was standing out that way, and I was like here (indicating) when he began shooting, and, if there had been any movement sideways to amount to anything, I could see I was in great danger of getting shot, for it was all done awful quick; just as quick as I believe any man could have done it in the world. Jess Allen, he got up when they commenced quarreling. He got up and walked around John and Mr. Pool and went and stood behind this tree, with his head down, whittling with his knife, and, when John began to pull his gun, Jess Allen started to run. He wasn't running fast, but started off moving pretty lively down the road, and had went down kinda into the holler, and went something like twenty steps from where he was standing behind that tree. John, after he quit shooting, he stepped right up something like I should judge five feet in front off to one side of where Mr. Pool was laying and throwed the cartridges out of his gun and took it and stuck it right back in his clothes that way, and Jess came back up and went right on by us, and he ran something like 30 steps the other way south, and I hollered at him and says, 'Jess, come back and let's go to the mill and report what's done;' and he come back, and, before he got back up even with where Mr. Pool was, why I done started on and took the lead and him and Johnny after me."

He further testified that John didn't call Allen back and asked him how he was going to swear; did not remember whether he said anything to John immediately after the shooting; that he (witness) did not have anything to do with the killing.

On cross-examination he testified: He saw John that morning coming out of the road with a shotgun; knew of no reason why John would be carrying a pistol that day. When the last shot was fired, Pool was leaning on his elbow and fell over. He was down when the last shot was fired; was making no demonstration then; knife in his hand; died with the knife in his hand. That Pool was cursing Turnbow that day, and said he had notion to kill him.

Defendant John Buxton, as a witness in his own behalf, testified that:

"On the morning of the 18th I took a shotgun and went out in the woods squirrel hunting, and when I was coming back home I met my father and Jess Allen in the road, going over to the mill, and I asked them where they were going, and they said to the mill to scale up their logs. I went home and ate breakfast. It was then about 7 or 8 o'clock. I then went over to the mill. I stayed around the mill until about noon, and Mr. Pool came back from scaling logs. He told me they had been out there scaling. He said he had scaled my logs that were out there on the Nelson place, so I told him I would go over after dinner. He said he was going to scale the rest of them that evening on the twenty acres east of there, where we cut some logs, and I told him that I would come over and go down and scale up the rest of my logs. I went home, and after dinner I went over to the woods where the logs were at and sit down there on a log by the side of the road and waited until they come. And when they come we went on out east across the road, probably 75 or 100 yards, before we struck any logs where we had cut, and I set down on a log, when they went scaling my father's logs, and after they got them scaled they called me, or my father did, and I went out there and scaled the rest of my logs that we had there; only a few, I don't remember how many, ten or twelve of them. Jess Allen said he had the number of my logs scaled up there, and I asked him how many, and the way he had his figures put down he did not understand it himself. Mr. Pool, who had them on his book, you know, and was showing him what he had them down there, and made some remark about the amount of logs. The amount of thousand feet I had scaled, and something was said about that; I don't remember just how it started, but he claimed that the month before that I had only cut 7,000 feet. There was some of the stuff Mr. Lear was giving us two dollars and a half and

six bits a thousand, for cottonwood. We got a dollar a thousand for the other logs, and I had cut something over 9,000 feet of that dollar and six bits stuff, and a little over 14,000 feet of the two and a half stuff; it all amounted to $44.65. And Pool said I didn't cut any such a damn thing, and that I only cut 7,000 feet of that two dollars and a half stuff. That there was not but 14,000 feet in all that I cut the month before. I told him it could not be that way, because Mr. Lear went out in the timber, him and I and Wooten, the man that was working for Mr. Lear, and scaled the logs, and he paid me in full for every log that I cut there. I never had had any settlement with Mr. Pool at all; Mr. Lear was doing the paying; and he said he was going to scale them all over from start to finish. He had sawed part of them up, hauled them all out of the timber, and part was in the yard and some in the timber. Said he was going to scale them, and wouldn't pay me for a God damn thing only what was on his books. I called him a God damn liar, and told him he wasn't going to scale my logs that way, because Mr. Lear had scaled my logs and paid me, and that had nothing to do with the pay day then at all, because Mr. Lear scaled the logs and marked them in the timber so they could be told from any other logs I cut after that; they done was marked. He cussed me and said he would be God damned if he would do any such as that, and I must be trying to it run over somebody. I told him I wasn't going to try to run over him, but he wasn't going to scale my logs, for it didn't have nothing to do with them. When he cussed he got up, and he was standing here and had his knife in his hand, and he cut me with his knife. ·When he struck at me and cut me, I backed off a step or two to get my gun out, and it kinda hung in my clothes. When I pulled it out I shot him."

He further testified that "it was just a little old pocket knife;" that Pool cut him once on the breast and twice on the arm; that he was carrying the pistol for protection against Frank Vansel and Charley McCoomis, as he had been told by different parties that they were laying in the woods waiting to kill him; that he fired the shots in self-defense, believing that he was in danger of losing his life; and that "I shot him to keep him from killing me." He denied making any statement to Allen as to what Allen should testify to.

Mrs. Ruth Holden testified: That she is the daughter of A. F. Buxton; is married, not living with her husband, and

had not since about May 18th; knew Jess Allen. That she had a conversation with him at the city jail after the killing, and Allen said he had sworn falsely in the preliminary trial against witness' father, and was sorry, and wanted her to forgive him. The jailer was then standing by the window. That she went driving with Allen. That at another time Allen said the same thing, and, further, that he did not want to go on the witness stand and perjure himself. That if she would go to Texas with him he would not come back. Further, that he had a horse and buggy on which there was a mortgage. That he would turn the buggy back and sell the horse and get money to leave.

### State's Rebuttal.

Cleve Smith testified that, in company with Wes Smith, Ode Hornbeck, and W. M. Langley, he met defendant John Buxton about 1 o'clock on the day of the killing, and asked him if he was going to the picnic, and defendant answered:

"Yes, if he could get a settlement out of those damned fellows over there, and he was going to have a settlement if he had to kill some of the s—— of b——s."

To the same effect is the testimony of W. M. Langley.

J. E. Lackey testified that he heard defendant John Buxton state about the 1st of July that the company was beating him, and "if they do I am going to kill Pool, and I want a crack at Capt. Lear."

Two or three other witnesses testified to having heard defendant make indirect threats against deceased.

Mr. Wyrick testified that he was associated with the deceased, Sloan Pool, in running the sawmill at Frogville; that the deceased was keeping scale, and witness was sawyer in the mill; that he had never heard Mr. Pool use an oath; that, on the day of the killing, defendant John Buxton came to the mill in the morning and remained until midday, and he noticed that he was carrying a pistol under his jumper.

The first assignment of error is that "the court erred in overruling the motion for a continuance." The affidavit for a

continuance contained all the formal allegations required by law, and, among others, the following statement:

"That on the 7th day of November, 1912, he filed a praecipe, and caused to issue a subpoena for Mack Ham, of Frogville, Choctaw county, Okla., and had the same placed in the hands of the sheriff of Choctaw county for service. That the sheriff's return on said subpoena shows that said witness has not been found. That, if the witness Mack Ham were present and sworn, he would testify in substance that on the day of the homicide, for which these defendants stand charged, he, in company with another party was traveling a road some 75 yards distant from the place of the homicide. That their attention was attracted by what to them at that time appeared to be a quarrel between two parties, neither of whom he knew. The two parties were both visible to him, and he saw at that time two other parties present, making in all four people present where the quarrel was taking place. He saw one of the parties get up off a log and walk around in front of the other party, and he heard him state, 'If you say I have cheated you, you are a damned liar.' There were other words passed which affiant did not understand at that time. One of the parties, who seemed to have a stick in one hand, advanced toward the other party, holding the stick in the left hand, and with his right hand made two or three strikes at the other party as though he was cutting him with a knife, when the party being assaulted drew a pistol and fired either five or six shots. That the said witness, if present, would testify that the party who did the shooting did not go to the body of the deceased after the shots were fired, and did not draw his gun on any other person. That affiant and the other party who was with him remained where they were standing for five or ten minutes after the shooting, and then went on the road toward Ft. Towson. That they did not go to the body of the deceased or the immediate place of the homicide because they did not want to be witnesses in the case. The defendant is informed: That the said Mack Ham has removed from the county of Choctaw and now resides in the state of Texas. That he did not know of his removal from the county of Choctaw in time to procure his deposition to be used in this cause. That his absence is not caused by his consent or procurement. That the testimony of said witness is material, and the defendant believes the same to be true. That, if this case should be continued for the term, the defendant will be able to procure the

attendance of said witness or secure his deposition. That defendant has no other witness by whom he can prove all of the facts that he seeks to show by this witness. Wherefore the defendant prays that this case be continued for the term, in order that he may procure this testimony."

The record shows that defendant was not put upon trial until more than four months after his arrest. Had the defendant exercised due diligence, he could have learned, within a very short time after November 7th, the date of the issuance of the subpoena, that said witness was a nonresident, and proceedings to procure his deposition should have been taken.

In our opinion the application lacks evidence of good faith, and the affidavit does not. disclose such diligence on the part of the defendant to procure the attendance of this witness as the law under the circumstances of the case required, or such as made it the duty of the court to grant the continuance. *Key v. State,* 10 Okla. Cr. 207, 135 Pac. 950; *Hopkins v. State,* 9 Okla. Cr. 104, 130 Pac. 1101; *Boswell v. State,* 8 Okla. Cr. 152, 126 Pac. 826.

The second assignment is that "the court erred in overruling the motion to quash the jury panel." In support of the challenge and objection to the panel, the record shows that at the time of the hearing on the said motion to quash, and challenge to the panel, and before the drawing of the jury, it was stipulated and agreed as follows:

"It is agreed by and between counsel for the state and for the defendants: That the jury commissioners, in making the proportionment for the selection of jurors from which the present panel is drawn, selected the jurors from the six municipal townships in Choctaw county, and that the proportion in four of the six townships was made practically correct. That in one township the commissioners selected 55 jurors, when there should only have been, if properly proportioned, 48. That in another township the commissioners selected nine jurors, when there should have been, if properly proportioned, twenty."

It is our opinion that, before the defendant can avail himself of any irregularity on a challenge to the panel, he must show intentional omission on the part of the jury commissioners from which he has suffered material prejudice.

Our Procedure Criminal provides that:

"A challenge to the panel can be founded only on a material departure from the forms prescribed by law, in respect to the drawing and return of the jury, or on the intentional omission of the sheriff to summon one or more of the jurors drawn, from which the defendant has suffered material prejudice." (Section 5842, Rev. Laws.)

The motion to quash, or challenge to the panel in this case, does not state any facts from which the defendant has suffered material prejudice. The fact that the jury commissioners failed to strictly follow the provisions of the jury law is not in itself a sufficient ground to sustain a challenge to the panel. It must be shown that such irregularities were prejudicial to the substantial rights of the defendant. The challenge to the panel was properly overruled. *Watson v. State,* 9 Okla. Cr. 1, 130 Pac. 816; *Edwards v. State,* 8 Okla. Cr. 341, 127 Pac. 872.

The next assignment is that the court erred in permitting the state, over his objection, to ask the defendant on cross-examination "whether or not he was a fugitive from justice." The court ruled that "he need not answer unless he wants to." The defendant answered:

"I don't know whether to say 'Yes' or 'No.' I will not answer the question that way, because I don't know whether I am or not; under the circumstances of that case, I don't know. If I knew I would answer 'Yes' or 'No.'"

He was then asked:

"Have you made bond for your appearance in the circuit court to answer certain charges there?"

And answered:

"My father and Jim Holder made a bond for me to appear there during court."

He was then asked:

"Have you ever responded to that bond in the circuit court of Sevier county, Ark.?"

And answered:

"I did. I was there while court was going on, and, after they adjourned court that evening, the sheriff told me to go down to his office, and he would give me a bond to take out home and have filled and put the case off until the next term

of court and bring it back to him. He give me a bond for $350, and told me to take it out there and get it filled. I goes home and stayed a couple of weeks, and I can't get this bond filled. I took the bond and goes back to De Queen, and I told the sheriff: 'Here is the bond you give me to have filled for my appearance at the next term of court. I don't know those people and I cannot make it. I guess you will have to put me in jail.' He says: 'That's all right, if I want you I will let you know. Just report once in a while where you are at.' And told me to go back home."

On redirect examination he was asked by his counsel:

"Q. State what the nature of the charge was, if any, they had against you there? A. Why, they had a charge against me for a breach of the peace and resisting an officer and drawing a gun. Q. Did you ever stand trial?"

In general it may be said that a defendant, by availing himself of the statutory privilege of becoming a witness in his own behalf, has voluntarily changed his status from defendant to witness, and thereby waives his constitutional exemption from being a witness against himself (section 21, Bill of Rights), and consequently may be cross-examined within the usual boundaries. Generally speaking, the question as to whether or not a defendant is a fugitive from justice is improper, and not admissible to discredit the witness, and an objection should be sustained. The defendant is only required to meet the specific charge made against him, and is not called upon to defend himself against any other charge. However, in this case, the court in effect sustained the objection, but the defendant voluntarily and without further objection answered the questions. and fully explained his conduct, showing that he had left Arkansas with the permission of the sheriff, and no instruction was asked that such testimony be disregarded by the jury. The evidence in chief by the defendant as to his reasons and purpose in carrying a shotgun and a pistol possibly opened the door wide enough to allow him to be asked the question.

The only assignment remaining which requires notice is that "the court erred in overruling the defendant's motion for an instructed verdict for the defendant A. F. Buxton." The record shows that, at the close of the state's evidence in chief,

defendant A. F. Buxton requested the court to instruct the jury to return a verdict of not guilty as to A. F. Buxton, and that the court stated that, at the close of the evidence, he would hear defendant on the proposition of so advising the jury. After the evidence was all in, and before the case was argued, the county attorney moved the court to advise the jury to acquit defendant A. F. Buxton. Thereupon the court so instructed the jury, and stated:

"If the jury concur in the opinion of the court, you may sign this verdict by one of your number as foreman, and, if not, you may indicate it, and I will prepare the general instructions. (The jury indicate that they prefer to wait until they go to their jury room to consider their verdict.)"

Our Procedure Criminal provides:

"If, at any time after the evidence on either side is closed, the court deem it insufficient to warrant a conviction, it may advise the jury to acquit the defendant. But the jury are not bound by the advice, nor can the court, for any cause, prevent the jury from giving a verdict." (Section 5896, Rev. Laws.)

Defendant John Buxton contends:

"That he was entitled to have the testimony of his codefendant given under circumstances most favorable to him, at least not unnecessarily unfavorable to him."

Under the statute, the jury are not required to take the advice given by the court. Whether or not the court erred in this respect depends upon the effect to be given the following statutory provisions:

Section 5046, Rev. Laws 1910, provides:

"No person shall be disqualified as a witness in any civil action or proceeding, by reason of his interest in the event of the same, as a party or otherwise, or by reason of his conviction of a crime; but such interest or conviction may be shown for the purpose of affecting his credibility."

There are certain statutory exceptions to this provision which have no bearing upon the question involved.

Procedure Criminal (section 5882, Rev. Laws) provides:

"Except as otherwise provided in this and the following chapter, the rules of evidence in civil cases are applicable also in criminal cases."

Section 5881 (Rev. Laws) provides:

"In the trial of all indictments, informations, complaints and other proceedings against persons charged with the commission of a crime, offense or misdemeanor before any court or committing magistrate in this state, the person charged shall at his own request, but not otherwise, be a competent witness."

Under section 5046 (Rev. Laws 1910), all persons are competent witnesses, unless shown to be within the statutory exceptions, and the reason for many rules of the common law, based on the incompetency of parties, has ceased to exist.

Under section 5881, *supra,* in all criminal trials "the person charged with crime shall at his own request, but not otherwise, be a competent witness."

By these provisions, when a defendant requests to be a witness, and takes the witness stand in his own behalf, he has voluntarily changed his status from defendant to witness, and he becomes a competent witness for all purposes. It does not matter whether his testimony is for or against himself, or for or against his codefendant. The only limitation in the statute is that he cannot be compelled to testify either for himself, his codefendant, or for the state, while he is a party in the case.

The following provisions of our Procedure Criminal prescribe the manner and mode of compelling a codefendant to testify as a witness, conditioned upon his ceasing to be a party in the case:

Section 5879 (Rev. Laws 1910) provides:

"When two or more persons are included in the same indictment or information, the court may, at any time before the defendants have gone into their defense, on the application of the county attorney, direct any defendant to be discharged from the indictment or information, that he may be compelled to be a witness for the state."

Section 5880 (Rev. Laws 1910) provides:

"When two or more persons are included in the same indictment or information, and the court is of opinion that in regard to a particular defendant there is not sufficient evidence to put him on his defense, it must, before the evidence is closed, in order that he may be compelled to be a witness for his co-

defendant, submit its opinion to the jury, who, if they so find, may acquit the particular defendant for the purpose aforesaid."

The record does not show that defendant John Buxton requested the court to discharge his codefendant, or moved the court to direct a verdict of acquittal on the ground that the evidence for the state was insufficient to put his codefendant on his defense, and in order that he might be compelled to be a witness for his codefendant, John Buxton. The motions to acquit were made by defendant A. F. Buxton, in his own behalf. The record does show that this defendant's codefendant on his own request became a witness, not only in his own behalf, but in behalf of his codefendant, John Buxton, as well. The court further charged the jury as follows:

"You are instructed that the court is of the opinion that the testimony in this case is insufficient to warrant a verdict of guilty against the defendant A. F. Buxton upon a charge of murder, or of manslaughter in the first degree, and that you should return a verdict of not guilty as to the defendant A. F. Buxton."

If it were shown by the record that, when the state closed its evidence in chief, defendant John Buxton announced that he intended to use his codefendant as a witness, the point raised would be properly presented. We think that, in the absence of such a showing, this defendant cannot be heard to complain. It further appears upon the whole record that there could have been no prejudicial error in the court's ruling, so far as it related to defendant A. F. Buxton's motion to direct a verdict of acquittal, as defendant John Buxton had the full benefit of the testimony of his codefendant as a voluntary witness in his behalf.

Any one accustomed to weighing evidence cannot read the record without being fully impressed with the conviction that the homicide was the result of deliberate preparation. The jury, with a due regard for their oaths, could not have reached any other conclusion.

Upon a careful consideration of the whole case, we have discovered no error to the prejudice of any of the substantial

rights of the defendant. Wherefore the judgment appealed from is, as the law demands, affirmed.

It appears from the record that, while this appeal was pending, the act of March 29, 1913 (Laws 1913, c. 113), regulating the infliction of the death penalty, became effective. As the day fixed for the execution of the judgment and sentence has passed, the cause is remanded to the district court of Choctaw county for the purpose of appointing another day, under the provisions of Procedure Criminal (sections 5979 and 5980, Rev. Laws 1910), which prescribe the procedure when a judgment of death has not been executed on the day appointed; proceedings to be had in accordance with the rule prescribed by this court in the case of *Alberty v. State,* 10 Okla. Cr. 616, 140 Pac. 1025.

The warden of the penitentiary will surrender the defendant to the sheriff of Choctaw county, who will hold him in custody pending the proceedings in the trial court, or until his custody is changed by due course of law.

ARMSTRONG, P. J., and FURMAN, J., concur.