## S. T. RAMEY v. STATE.

No. A-9647.   April 18, 1940.
(101 P. 2d 856.)

Grant Gillespie, of Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, P. J. This appeal is from a judgment rendered upon the verdict of a jury finding S. T. Ramey guilty of the crime of larceny of a domestic animal, and fixing his punishment at two years' imprisonment in the state penitentiary.

The information in substance charged that in Okmulgee county, on or about the 31st day of July, 1938, Esteller Ramey did take, steal and carry away from the possession of Chester Perkins, without his consent, one two-year old white faced dark red bull, the property of the said Chester Perkins. After the overruling of a motion for a new trial December 8, 1938, the court rendered judgment. On March 6, 1939, a supplemental motion for a new trial on ground of newly discovered evidence was filed, which, upon the hearing April 4, was overruled.

The grounds of the motions for a new trial, and here assigned as error, are that the verdict of the jury was not supported by sufficient evidence and is contrary to law, and that the court erred in denying a new trial on the ground of newly discovered evidence.

From the evidence it appears that the alleged owner, Chester Perkins, had about 20 head of cattle in W. H. Cooper's pasture, in Okmulgee county in the summer of 1938, among them the two-year old bull in question. That on July 31st, he saw the bull in the pasture; five days later he went to the pasture to inspect his livestock and found the bull missing. On August 2nd the defendant

in company with a colored man who gave his name as J. A. Tatum were at the Tulsa Stockyards with this bull and a Jersey cow, which were there sold.

W. H. Cooper testified that he lives three and three-quarter miles east of Bald Hill, in Okmulgee county, that he had in his pasture, during the summer of 1938, about 20 odd cattle, including a dark red white faced bull, about two and one-half years old, all the property of Chester Perkins. That he lives right at the pasture. Chester Perkins, who lives across the county line in Muskogee county, came over August 5th and they missed the bull, that they looked at the pasture fence and it was in good shape, and they made a search in the neighborhood, but could not find the bull.

J. G. Carr testified that he was a cattle salesman for the Blackwell Commission Company, Tulsa Stockyards, and knew the defendant, S. T. Ramey; that on the 2nd day of August, 1938, the defendant brought a red bull and a cow there, a colored man was with him, the defendant told him to sell the cattle, which he did, and the payment was made by check; he produced and identified the check and it was admitted in evidence. The check dated August 2, 1938, payable to S. T. Ramey, was for $93.05.

John Forbes testified he was deputy sheriff of Okmulgee county, and arrested the defendant on the charge now pending; that in a conversation with him the defendant stated that he in company with J. A. Tatum took this cow and this bull to the Tulsa Stockyards, and sold them; he said that J. A. Tatum lives around Bald Hill, that he had met him late one night coming down the road and made arrangement either to buy these two head of cattle or haul them to Tulsa for him, that he drove to his home in Bixby that night, and from there to Tulsa

the next morning, and J. A. Tatum was with him and was at the stockyards when they sold the cattle.

At the close of the testimony for the prosecution, the defendant demurred to the evidence on the ground that there is no evidence tending to identify the cattle alleged to have been stolen with the cattle afterwards found, and moved the court to instruct the jury to return a verdict of not guilty, which was overruled.

On the part of the defense, Helen Gordon testified:

"I am and was about the 2nd day of August, secretary of the Blackwell Live Stock Commission Company, at Tulsa. On the 2nd day of August, I saw the defendant and a colored man in the office, the colored man handed me a scale ticket and said his name was J. A. Tatum, and I took his name from the drive-in, the yellow sheet which they check cattle into the yards, containing the name of the consignor, the weight, and the price paid. When I started to write the check Mr. Ramey told the negro if he was not afraid to have the check paid to himself, he could get it cashed for him at the Bardon Pawn Shop, and the negro said it was all right, I then made the check payable to S. T. Ramey, and she identified the check introduced in evidence."

O. L. Mistler testified:

"I am foreman at the Tulsa Stockyards. On August 2nd, this year, I saw the defendant, S. T. Ramey, at the stockyards with two head of cattle, at the cattle dock, and I greeted him and asked: 'What firm do you want to sign your stuff to?' and he said, 'Talk to that boy over there and he will give you the whole business,' and pointed to a colored boy, who said his name was J. A. Tatum, and I made out the ticket to J. A. Tatum, and consigned them to the Blackwell Commission Company."

Bill Johnson testified:

"I have known the defendant for about 15 years, he has lived around Bixby most of that time. He buys and

sells a few live stock and works around; last summer about the first of August one evening I was present when a fellow by the name of Jess Darrow wanted him to haul a cow and Ramey said he was going down that night to stay all night, either to buy some cattle or haul them the next day."

That he knows the general reputation of the defendant as to being a law-abiding citizen, and that reputation is good.

Ed Key qualified as a character witness and testified that he has known the defendant all his life and knows his general reputation for being a law-abiding citizen in the Bixby community, and that reputation is good.

S. T. Ramey, as a witness in his own behalf, testified:

"I have lived at Bixby for 18 years, for the last five or six years I have been engaged in buying and selling live stock; I hauled a red bull from a place three or four miles south of Tobe Grayson's farm, and a red cow to Tulsa. The day before I talked with the party that claimed to own these cattle on the road near the Grayson farm.

"He stopped me and asked if I was buying stock, I told him 'Yes, I bought a few'. He said, 'I got a couple that I would like to sell', that they were back down the road, but I did not go down there that day to see the cattle, it was getting along in the evening. He wanted me to come back the next day, in the morning, and buy them or haul them for him, I told him I could not come the next morning, I had a load at home to take to Tulsa, he said he sure wanted to get them off tomorrow, I said, 'Well, I will come back from Tulsa, it is liable to be late when I come back', he said, 'Now, you come down and if I can't sell them to you I will hire you to haul them.' The next day, in the afternoon, about 5 o'clock I started down, when I got there it was sun down, he didn't

tell me his name, but I learned later that his name is Jim Brewer, he was there at that pasture, right at the gate and had the cattle tied there at the gate, I didn't buy them, but I hauled them for him. This man Jim Brewer did not go with me, he sent this Grayson boy with me, to Tulsa, I drove up there at the dock and unloaded them, the checking boy came out and asked who I wanted to check into, I said, 'That boy there will tell you, they belong to him.' We went into the office to get the check, the negro said, 'You reckon now I can get this check cashed here', and I said, 'I don't know, if you don't mind making it in my name, I can get it cashed for you,' and she just wrote the check in my name, I got it cashed and gave the money to him, all but $10 for hauling. John Forbes arrested me, about the first of August I think, he said, 'Is your name Ramey,' I said, 'Yes, sir.' He said, 'Did you or did you not buy a calf of Tobe Grayson about three weeks ago and give him $10 for it?' I said 'Yes, sir.' He said, 'Didn't you buy two of him?' I said, 'No, sir.' He said, 'Mr. Ramey, we have got Tobe Grayson over in the Okmulgee jail and he says that he sold you a calf for $10 about three weeks ago, and he said, 'I expect I will have to take you over for an investigation.' Our sheriff there at Bixby was standing there and talking to him. I got in his car and we came on. Right after I got in jail he came in there and said, 'Mr. Ramey, I have been up at the Tulsa Stockyards where you sold the white faced bull and the red roan cow about the first of August, Where did you get them or where did you buy them,' that is the way he asked me. I said, 'I didn't buy them, I hauled them for a fellow down west of Haskell, who hired me to haul them to the stockyards, I didn't have any interest in those cattle except to get the ten dollars for hauling them.'"

In rebuttal the state called Mrs. Lena Matthews, she testified:

"I live in Muskogee county, a mile beyond the Okmulgee county line, on the old Okmulgee road, I have several cows and calves, including a big red cow, the

last time I saw that cow was the evening of August 1st, just after sundown, my son had finished milking the cows, the next morning I missed the cow."

On cross-examination she stated her cow was in her own pasture and was not in Mr. Cooper's pasture.

The foregoing testimony embraces all the material facts in evidence.

It is urged that the court erred in overruling the defendant's demurrer, and motion for a directed verdict of not guilty, interposed at the close of the evidence in chief.

It is said in the brief of counsel for the defendant that:

"The state was compelled to rely wholly upon the alleged statements of defendant to witness Forbes at the time of the arrest and incarceration in the county jail; without this evidence the state failed to prove that the bull in question was feloniously taken or to connect the defendant, if it did, with said taking. At the time this evidence was admitted by the court there had been no evidence proving or tending to prove the corpus delicti. It is our further contention that the testimony of said witness concerning said alleged statements or admissions of said defendant is insufficient taken with all the evidence in chief of the state, to establish the corpus delicti."

Upon the record before us it is apparent that the foregoing contentions are without substantial merit.

It is not error to permit the introduction of the defendant's confession before the corpus delicti is proved; for, if the order of proof were reversed and the corpus delicti was first established, and then the confession, the result would not be different. It is the corpus delicti plus the confession, or the confession plus the corpus

delicti, that makes the case. State v. James, 96 N.J.L. 132, 114 A. 553, 16 A.L.R. 1141.

Two legal principles, so well established that it is unnecessary to cite authority in their support, are these:

The ruling of a trial judge in refusing to grant a motion for a directed verdict should not be interfered with, if there was any evidence on the issues in the case which required the submission of the question at issue to the jury.

If there is a conflict in the evidence, or different inference may be drawn therefrom, it is the province of the jury to weigh the evidence and determine the facts; and their determination should not be interfered with unless it appears that such determination was not sustained by sufficient evidence, or was influenced in some way by passion or prejudice.

It is no more the province of an appellate court than of the court of original jurisdiction to determine controverted questions of fact arising upon conflicting evidence. Neither can lawfully usurp the appropriate function of the other, and neither can substitute its own judgment for that of the jury, where the facts are reasonably capable of diverse or opposing inferences.

The truthfulness of an explanation of the possession of stolen property, although not contradicted, must be determined by the jury. Chesser v. State, 63 Okla. Cr. 84, 73 P. 2d 191.

It rarely happens that perpetrators of an offense committed in the manner here proven, can be shown by witnesses who saw and recognized the perpetrators in the act, and resort must therefore ordinarily be had to circumstantial evidence.

In our opinion the evidence was amply sufficient to support the verdict and judgment of conviction.

Under the general rule that the defendant cannot give his own self-serving declarations in evidence, the court did not err in overruling the supplemental motion for a new trial.

It appearing that the defendant had a fair and impartial trial, the judgment of the trial court is affirmed.

BAREFOOT and JONES, JJ., concur.