## TAYLOR v. STATE.

No. A-11487. Jan. 31, 1952.

(240 P. 2d 803.)

Windham & Windham, Poteau, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, J.  The plaintiff in error, Velva Taylor, who will hereinafter be referred to as defendant, was jointly charged with one Fred Mansell in the district court of LeFlore county, with the crime of larceny of domestic animals. A severance was granted, and Taylor was tried before a jury, was convicted and punishment assessed at three years imprisonment in the State Penitentiary. Appeal has been duly perfected to this court.

Counsel for defendant for reversal present four specifications of error.  We shall, for convenience, first consider the validity of defendant's contention that the court erred in overruling his motion to quash the jury panel drawn for the January, 1950, term of district court of LeFlore county.  This motion was properly filed and presented prior to the jury being sworn to try the case on April 20, 1950.

This was the first jury term held for the trial of criminal cases in said court following the enactment of Senate Bill No. 155, S. L. 1949, page 279, effective June 2, 1949, Tit. 38 O. S. A. §§ 18-32, commonly known as "The Jury Wheel Act."  The provisions in question being quite lengthy, they will not, for our purpose, all be quoted, but reference to the various provisions is suggested.

Though eight separate points were advanced in defendant's motion as presented to the trial court, in brief filed in this court but three points are argued in support of the contention that there was a material departure from the method and procedure provided by the above referred to statutory provisions for the selection of a jury panel.

It is asserted particularly that the evidence supports defendant's contention that the jurors summoned to serve at the term of court in which defendant was tried and convicted were not substantially drawn in the manner provided by §§ 18 and 19 of Tit. 38, O. S. A., hereinafter quoted, and that the deviation was substantial and material.

Section 18 provides:

"Meeting for selection of jurors.—Between the tenth and twenty-fifth day of November of each year, the County Treasurer or one of his deputies, together with the County Assessor or one of his deputies, together with the Sheriff or

one of his deputies, and the County Clerk or one of his deputies, and the Court Clerk or one of his deputies, shall meet at the Courthouse of their County in the office of the County Clerk and select from the list of qualified jurors, as prescribed by this chapter, of such county as shown by the tax lists in County Assessor's office for the current year, all qualified jurors for service in the District, Superior, Common Pleas and County Courts of such County for the ensuing year in the manner hereinafter provided."

Section 19 provides:

"Writing names on cards—Deposit in wheel—Form of wheel—Locking.—Said officer shall write or cause to be written the names of all persons who are known to be qualified jurors under the law on separate cards of uniform size and color, writing also on said cards, whenever possible, the post office address of each juror so selected, the expense thereof to be paid from the court fund of each county, said names and addresses of such qualified voters to be typed upon the cards as herein described under the supervision of the Court Clerk. The cards containing said names shall be deposited in a circular hollow wheel, to be provided for such purpose by the Board of County Commissioners of each county after they have examined the contents thereof and removed therefrom and destroyed any cards found therein. Said wheel shall be in the form of a drum made of iron or steel and shall be so constructed as to freely revolve on its axle and big enough to freely mix all the cards placed therein, the size thereof in each to be determined by the number of names placed therein and shall be kept locked at all times, except when in use as hereinafter provided, by the use of two separate locks, so arranged that the key to one will not open the other lock; and said wheel and the clasps thereto attached into which the locks shall be fitted, shall be so arranged that said wheel cannot be opened unless both of said locks are unlocked at the time the wheel is opened. The keys to such locks shall be kept, one by the Sheriff and the other by the Court Clerk. The Sheriff and the Court Clerk shall not open such wheel, nor permit the same to be opened by any person, except at the time and in the manner and by the persons herein specified; but said Sheriff and Court Clerk shall keep such wheel, when not in use, in a safe and secure place where the same cannot be tampered with."

Defendant complains and asserts:

"1. At the meeting in the office of the County Clerk no effort was made to select qualified jurors, as provided by law, of such County as shown by the tax lists in the County Assessor's office for the current year, but instead, they decided to have a complete typewritten list prepared of all names, regardless of qualifications for jury service, appearing upon the tax lists in the County Assessor's office; they then adjourned and met again when notified that the list of tax payers had been completed, at which time the County Attorney was present; they went over the list and eliminated certain persons whom they knew to be disqualified or excusable from jury service, such as school teachers, postmasters, women and persons convicted of crime; that no effort was made to ascertain the qualifications of the persons whose names remained on the list. This meeting was held in the office of Mr. Ferguson, the County Treasurer, and the list thus completed was turned over to the Court Clerk, who placed it in a steel cabinet in his office and kept it there for several days until the jury wheel, which was being prepared, arrived.

"The combination to the cabinet was known to him and his deputy, and the cabinet was not at all times closed during the day when they were in the office working.

"2. When the jury wheel arrived, the Court Clerk and the Sheriff removed the list of names from the safe in the office of the Court Clerk, placed them in the jury wheel, which was thereafter kept in the office of the Sheriff in a compartment upon which there was a Yale lock, to which the Sheriff and Undersheriff had a key and in which, in addition to the jury wheel, as aforesaid, there was kept liquor, weapons and other objects in the custody of the Sheriff, to be later used as evidence in cases to be tried; that the other deputies, and the City

Officers, had access to the Sheriff's office both night and day, for the purpose of obtaining access to the elevator and putting persons in prison.

"3. The Board of Commissioners did not meet and examine the jury wheel for contents prior to the time the names constituting the list of jurors, as aforesaid, was placed therein. In fact, the Chairman of the Board of County Commissioners testified (C. M. 29-30) that he had never seen the jury wheel and the only thing he knew about it was that he told the County Clerk to order it."

It is also urged that under authority of Grant v. State, 11 Okla. Cr. 396, 146 P. 919, a case claimed to be applicable to the case at bar, that it was not necessary for the defendant to show actual prejudice. It is said:

"that to hold otherwise and require defendant in every case, regardless of the extent of the deviation to make a showing of actual prejudice would render the statutes nugatory and they would constitute a mere suggestion of the manner of procedure which the officers on whom that duty is enjoined, might disregard at will, and to proceed in any manner they might wish so long as the defendant was unable to show actual prejudice resulting therefrom."

The defendant called as witnesses to support his motion to quash the jury panel, David Howery, county clerk; Paul Mathis, county commissioner; Jack Huff, court clerk; and Jack Craig, sheriff.

It is well to note that no fraud was charged and no actual prejudice alleged or shown. The evidence does show, however, that when the designated officials met to select the jurors as provided by the heretofore quoted statutory provisions, that the jury wheel theretofore ordered by the county commissioners as by law provided, had not yet arrived. Nevertheless, the proper officers did meet in the office of the county clerk to discuss the new law and to make up a list of qualified jurors from the tax list in the county assessor's office for the current year. To accomplish this, county clerk Howery testified that "we decided to take the regular tax list—to take the tax list, and under the supervision of the Court Clerk, we would have a typist to copy the list of the tax payers from that list. We would determine the best we could who were to serve on the jury, or the ones who were eligible to serve as jurors."

Witness stated that after the first meeting the officials adjourned to the county assessor's office for the purpose of checking the tax rolls and designating the names to be typed. They decided to have all names typed and for convenience this sheet was used in making the designations. The names were typed on perforated sheets, and there was a space for addresses. They had the county attorney present when deciding on who was eligible to serve as jurors.

Their next meeting was in the treasurer's office, and after they completed their work, the jury wheel still not having arrived, they had the names placed in the court clerk's steel cabinet with combination lock and locked up for a few days until the jury wheel arrived. The court clerk and the sheriff, on arrival of the jury wheel, placed the names in it and the wheel was locked with two separate locks, as provided by statute, the court clerk keeping one key and the sheriff the other. A particular key would unlock but one separate lock.

County commissioner Mathis testified to authorizing the construction of the jury wheel, but testified that he did not examine it prior to the placing of the ballots in it, and had in fact never seen the wheel, but that there had been no prior use of it.

Court clerk Huff testified to the preparation of the jury list substantially as testified by the county clerk. and he stated that awaiting the arrival of the jury wheel he kept the jury names locked in a steel cabinet where he kept his

official funds, and in his office. The lock was a combination lock and his chief deputy knew the combination. He stated that immediately on delivery of the jury wheel a few days later he and the sheriff placed the names in the wheel and that he had a lock and key, and the sheriff had a lock and key, and that the wheel was locked with the two locks and his key would not unlock the sheriff's lock, and the sheriff's key would not unlock his lock, and that he kept his key in the court clerk's office but that his chief deputy had access to it.

Sheriff Craig testified that his undersheriff worked with the other officials a day or two in making up the jury list; that he first came in the picture when the court clerk called him to his office to help him remove the names from the steel cabinet; that they took them to the sheriff's office and placed them in the wheel; that the clerk and sheriff had separate locks and keys and locked the wheel and the Sheriff stated that thereafter the jury wheel was by him locked in a back inner office accessible only through a steel door locked by a Yale lock; that he and the undersheriff each carried a key to this room.

There is no doubt but what the statutory provisions should be conscientiously followed. The officials of the various counties should carefully read the separate provisions of the statute, Tit. 38 O. S. A. 1951 §§ 18-32, and as a practical matter should check with the county attorney to see that they do nothing that might form a basis for complaint. The solution of the questions raised in each case, however, must be governed by the facts peculiar to that case. And in considering the acts of the officials the jury wheel act itself provides the rule by which courts must be governed. Tit. 38 O. S. A. § 29, in part provides:

" * * * A substantial compliance with the provisions of this Chapter [§§ 18-32 of this Title], shall be sufficient to prevent the setting aside of any verdict rendered by a jury chosen hereunder, unless the irregularity in drawing, and summoning or empaneling the same, resulted in depriving a party litigant of some substantial right; provided, however, that such irregularity must be specifically presented to the court at or before the time the jury is sworn to try the cause."

Also Tit. 22 O. S. 1941 § 633, which has not been repealed provides in part:

"A challenge to the panel can be founded only on a material departure from the forms prescribed by law, in respect to the drawing and return of the jury, * * * from which the defendant has suffered material prejudice."

It is at once apparent that there is no conflict in the two statutory provisions above quoted. Therefore, the principles of law adhered to by this court in construing the prior statute would be applicable here.

In Houston v. State, 63 Okla. Cr. 49, 72 P. 2d 526, 528, this court said: " * * to entitle a defendant to successfully challenge a panel of jurors, the burden is upon the defendant to show that the illegality or wrong which is the basis of such challenge is such as to have caused the defendant to suffer material prejudice."

See, also, in this connection, Dixon v. State, 89 Okla. Cr. 205, 206 P. 2d 231; Maddox v. State, 12 Okla. Cr. 462, 158 P. 2d 883; Buxton v. State, 11 Okla. Cr. 85, 143 P. 58; Young v. State, 41 Okla. Cr. 226, 271 P. 426.

In the case particularly relied on by defendant, Grant v. State, supra, being a case that arose in the county court of Pottawatomie county, where the defendant was charged with the unlawful possession of intoxicating liquors, the clerk drew six names from the box and thereafter defendant challenged the integrity of the drawing of the jury by the clerk and the panel then in

attendance and prayed the court to call for the ballot box and to examine the same. In Grant v. State, supra, it is stated:

"Thereupon the court called for the box containing the ballots, but refused the request of the defendant to state in the record the facts relating to the ballots, but found six ballots therein fastened together with a clip. The court excused the jurors first drawn. Thereupon the clerk returned the ballots containing their names to the box, released the six ballots that were fastened, and proceeded to draw six ballots from the jury box, and drew the six identical jurors who had just been excused. The challenge was denied. The defendant challenged two jurors for cause, which challenges were denied, and challenged three other jurors peremptorily, thus exhausting his peremptory challenges. In support of the challenge, and the denial of the same as one of the grounds for a new trial, the defendant's attorney, Mark Goode, Esq., was duly sworn and testified as follows:

" 'That after examining the jury box from which the names in this cause were drawn, and the inspection thereof by the court, six names in the jury box held together with a clip, comprising the jury in the preceding case tried, were released, and the box shaken sideways; that the clerk then raised the lid to the cigar box, and this witness sat on the desk and watched the drawing thereof, and that each and every name on every slip showed face upwards; that the witness watched this drawing because of the preceding transaction, and knows that all names were face upwards; that he sat farther away from the box than the clerk did, and could read each name before it was withdrawn from the box.' "

In that case the court further refused to excuse a juror clearly shown to be disqualified, so that the case was reversed.

The record in the Grant case conclusively shows that the court clerk was handpicking the jury. In fact, his acts amounted to a fraud, and under such circumstances injury might be implied.

From a careful reading of the evidence in the within case we do not discover any action or conduct of the officials that was not motivated from the best of faith. It is true that when the names for the jury wheel were finally selected the wheel had not yet been delivered, and it being impossible for the court clerk and the sheriff to place the names in the wheel by reason of such fact, the court clerk proceeded to lock up these names. It is true that the deputy clerk knew the combination to the steel cabinet, but there is no evidence and it is not even alleged that he tampered with the names or handled them. Section 18 of the Title provides, however, that the deputies of the designated officers may act in their stead, and none of the other sections are in conflict with this. It is true that there is a provision in Section 19 that reads: "* * * The keys to such locks [to the jury wheel] shall be kept, one by the Sheriff and the other by the Court Clerk." Section 21 provides that a deputy of the court clerk and a deputy of the sheriff may act in drawing the names from the wheel, and at such times would of necessity be entrusted with the keys. The spirit of the act would seem to imply that at all other times the court clerk and the sheriff should each keep their respective keys in a safe place where the same would not be subject to use or appropriation by others.

It is also true that in the within case the board of county commissioners did not appear and examine the jury wheel prior to the court clerk and the sheriff placing the names of the jurors therein; and while ordinarily this might be a serious matter, the record shows that the jury wheel had never been used before and that this was the first selection of names for the wheel under the new law, and there could not have been cards in the same left over from a previous year.

We do not find from the facts peculiar to the within case that the stated irregularities in the drawing of the jury panel resulted in depriving the defendant of any substantial right.

We now consider the appellant's contention that the trial court erred in overruling the motion to suppress the evidence.

The motion was not filed until the day the case came on for trial, but evidence to support the motion was heard prior to trial. The court sustained the motion in part, and overruled the same in part.

The first witness called by the defendant was Sheriff Jack Craig, who testified that he was called to Talihina to make an investigation which resulted in the filing of the charges against the defendant; that he went to the home of Velva Taylor and that he did not have a search warrant.

The defendant Velva Taylor testified that he was down in his pasture when the sheriff entered and searched his home, and that he had not consented to the sheriff entering his home. This completed the evidence for the defendant.

Sheriff Craig was then called by the state, and testified that he found hog entrails in the pasture adjoining defendant's home. He stated:

"I trailed blood up to the house. Q. From where? A. From down at the edge of the woods in the pasture where I found the hog entrails, nearly up to the house. Q. You trailed the blood up to the house? A. Yes, sir, and walked upon his backsteps, inside it was blood on the back porch and a lariat rope on the back porch with blood on it, and I seen a piece of meat laying on the kitchen table—hog meat that had been cooked on the stove in the house."

Witness further stated that it was fresh hog meat, and that there had been a shower of rain and that the blood he trailed was still soft. He testified that the house had a fence around it and admitted that he followed the blood to the fence and then went inside and then on to the back porch; that defendant had gone with him to the pasture to search for the lost hog that he was searching for that had belonged to Cephus Jones, and that defendant had left him in the woods and he did not know where he was, but that he called defendant two or three times and waited ten or fifteen minutes and when he did not show up he walked in the house and found the meat in the kitchen.

The court ruled:

"I think the sheriff was strictly within his rights until he got to the gate. I will overrule the motion and sustain the objection to the testimony of that part of it when we get to it. I think that would be the proper way of handling it. Mr. Babb: The testimony obtained by the sheriff from the time he left the line of the yard to the house would not be admissible, but all above that line would be, your Honor—outside. Mr. Windham: The barn or outside, anything that would be considered the curtilage. The Court: I sustain the motion to the extent of suppressing the testimony as to the search of the dwelling."

Of course, the ruling of the court to the effect that no testimony concerning the search of defendant's residence was admissible, was correct. It is also true, as contended by counsel for the defendant, that any evidence that might have been obtained by the sheriff while searching the curtilage of defendant's home would be inadmissible. James v. State, 94 Okla. Cr. 239, 234 P. 2d 422. Such evidence would have to be objected to, of course.

It is argued by defendant that subsequently, on trial, the admission by the court of evidence obtained by unreasonable search had the effect of nullifying and denying in its entirety the motion of defendant to suppress. This contention

requires a consideration of the evidence presented by the State on the trial, and will be considered along with defendant's next proposition.

We now consider the specification that the trial court erred in overruling defendant's demurrer to the evidence of the State interposed at close of the State's evidence, and again at the close of all the evidence, and in overruling defendant's motion to instruct a verdict in his favor.

It is denied that the State proved the corpus delicti; that is, that a crime was committed; and, second, that the crime charged was committed by the accused. It is claimed that at most the evidence only raised a suspicion of guilt of the accused.

The information filed against defendant was based upon an alleged violation of Tit. 21 O. S. 1941 § 1716. The charging part of the information reads as follows:

"That the said Velva Taylor and Fred Mansell, in the County and State aforesaid, on the day and year aforesaid, did unlawfully, wrongfully, stealthily, fraudulently and feloniously take, steal and carry away one hog of the personal property of one Cephus Jones, without the knowledge and against the will and consent of the said Cephus Jones, the true owner thereof, and with the unlawful, fraudulent and felonious intent then and there on the part of them, the said Velva Taylor and Fred Mansell, to deprive the said Cephus Jones of said property and to convert the same to the use and benefit of them, the said Velva Taylor and Fred Mansell; contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State."

The pertinent portion of the statute above mentioned reads:

"Any person in this State who shall steal any horse, jackass, jennet, mule, cow, or hog, shall be guilty of a felony and upon conviction shall be punished by confinement in the State Penitentiary for a term of not less than three years, nor more than ten years; * * *."

Counsel for defendant cite a number of cases in support of the proposition that "where it clearly appears that the findings of fact and the decision of the trial court has no substantial support, or is clearly without support in the evidence, the judgment will be reversed;" also that "The corpus delicti in a criminal case cannot be established by the extrajudicial confession or admission of the defendant alone." There can be no doubt that these stated propositions are, in the abstract, correct statements of rules of law prevailing in this jurisdiction.

It is also contended by counsel that the mere admission of inculpatory facts are not necessarily confessions, and that when a person only admits certain facts from which the jury may or may not infer guilt, there is no confession. Cited is Edwards v. State, 58 Okla. Cr. 15, 48 P. 2d 1087. Further cited is the rule of evidence stated in 20 Am. Jur. 463, Sec. 551, in part as follows:

"If a statement is admissible in evidence as an admission or declaration, it is admissible as an entirety, including parts that are unfavorable, as well as those that are favorable, to the party offering it in evidence."

Also cited is 22 C. J. S., Criminal Law, § 842, p. 1478, where it is said:

"Where the state introduces in evidence the confession of accused, it is bound by exculpatory statements contained therein unless they are shown by the evidence to be untrue; but the falsity of such exculpatory statements may be shown by circumstantial as well as by direct evidence".

Finding no fault with these abstract propositions of law, and approving the same, we now test their applicability to the facts developed in the within case.

But in considering the questions raised, it should be kept in mind that we have held that the corpus delicti of an offense may be established by circumstantial evidence. Ramey v. State, 69 Okla. Cr. 257, 101 P. 2d 856. And keeping in mind our further holding expressed in Pebworth v. State, 88 Okla. Cr. 97, 199 P. 2d 621, 622, and other cases, where we said:

"The Criminal Court of Appeals will not reverse a conviction upon the ground that the evidence is insufficient to sustain the same, unless there is no testimony in the record from which the jury could reasonably conclude that the defendant was guilty, there being no contention that the jury was influenced by improper motives in arriving at the verdict."

The state first offered the evidence of Sheriff Jack Craig. The sheriff testified that on the morning of October 3 he was called to Talihina concerning a hog reported to have been taken from Cephus Jones; that he met Mr. Jones about three miles out of Talihina and that Jones accompanied him to Velva Taylor's place; that Taylor, the defendant, came out on the front porch and invited them in; and that they visited on the porch a while. The sheriff testified that he finally asked Taylor if he had any fresh meat around there, and Taylor stated that he did not. The sheriff then said, "I understand there has been a hog killed close to your place, do you know anything about it?" and Taylor said, "No, I don't." The sheriff then stated that he was going to see about it, and all three of them went out to the pasture where the hog had been butchered. The sheriff further testified:

"* * * we found hog entrails there and a piece of rope down there and a lot of tracks and stomping around and cigarette butts and stuff like that. It rained, or showered, during the night and kind of done away with the tracks, you couldn't get no tracks, and we immediately began to hunt and trying to find the rest of the hog, or hide, or head, or anything, and were unable to find any, and I made quite a few circles there, and eased on up toward the house and got close to the barn. There is a gate that comes out of one pasture into another I presume—I presume there is a gate there, and I began to strike some blood—I presume it was blood, and I followed it right on up to his yard gate. Q. Well, did you then talk to Velva any more? A. Yes, sir. Q. Go ahead and tell what was said. Where was he when you tracked the blood up there? A. He was over in the woods. I guess it would be—I rather think, west of the house, I don't know. Q. Did you call to him or anything? A. I called him several times and he came up. Q. What was said then? A. I told Velva, 'I thought you said you didn't have no meat here at your house.' Q. What did he say? A. He said, 'I lied to you. The dogs killed Cephus' hog', and said, 'I had to dress it —what was left of it,' and said, 'I was figuring on going over there some time today and paying him for his hog.' Q. What time of day was that, Jack? A. I imagine around eleven o'clock in the morning, A.M. Q. What did you do, put him under arrest? A. I placed him under arrest and took him and put him in the Talihina jail and went on. Q. After you put him under arrest, did you go in the house for him? A. He said, 'Come on in the house, I would like to change clothes,' and he went in there, and he had a fire in the house in the cook stove and with a ham of meat in it, and turned the fire out and opened the ice box and said, 'Cephus, there is your meat. Carry it with you.' And he said, 'I have no way of carrying it.' And he said, 'Come back any time today and get it, the house will be open.' Q. Then you took him on to Talihina? A. Yes, sir, and brought him in here later. Q. Was the meat skinned or unskinned? A. Skinned. Q. You never did find any head? A. No, sir."

Of course it was competent for the sheriff to recite his conversation with the defendant, so that if the jury believed the witness, then the very evidence that the defendant sought to have suppressed he voluntarily supplied after inviting the sheriff in his home after his arrest.

Cephus Jones testified that he lived about six miles east of Talihina, that the defendant lived in the neighborhood, that on October 1 he found some of

his hogs over in front of defendant's place and started to drive them home and the hogs scattered on him, two sows and two barrows, and he decided to wait until the next day, figuring they would bunch up again; that the next day was Sunday and on the way home from church about five o'clock in the afternoon he drove up to Taylor's house looking for the hogs and he saw Lloyd Taylor on the front porch and saw one of his barrows in the pasture adjoining the house, and he said to Lloyd: "There is one of the hogs I was looking for," and Lloyd said, "Yes, the boy said for them to put it up, and they have got some out in the pen." Jones testified that they found two of the sows in the loading pen. He stated that they ran the barrow in the pen and called for the other barrow but it never showed up. Witness stated that he said to Lloyd, "reckon what it is going to cost us," and Lloyd said, "Nothing, I guess, he didn't charge Henry Ryan for putting up his steers", and that witness replied, "I will be back early in the morning some time to pick the other one up." Witness stated that later he decided to come back that evening [Sunday] and look for the barrow. He testified:

"So, when I went back up there, I was going along in the little old field where I had found them before, and I heard a shot, and I stopped and I heard another one, and I got my directions. As I was going along I began to hear something that sounded like scraping, and so I began to look—then it was just sundown—getting dusky dark, and I began looking through the thicket and I discovered two human beings humped up, and I could hear them scraping and skinning a hog. It was very plain. And I stood and looked at them a little bit, and I thought, I'll have to get somebody else with me for the proof, and so I hurried back to the truck and went to town to get somebody to come with me. Well, it was in the neighborhood of an hour and a half when I got somebody to come with me, and when I come in a different direction I couldn't find the particular spot, and we looked until away in the night and couldn't find it and give it up. The next morning I drove back up to the house [Monday] and when I drove up two of the little boys come to the door and I asked if the barrow had ever come up and they said, 'Daddy knows more about it—he is in the pasture hunting for a horse.' And I turned around and drove through a pasture, and another pasture and over a little hill, and I parked the truck and went to the pasture, and the way I went in the first part of the night, I found the spot, and I looked all around and found all the entrails were still laying there—hadn't been moved, and so when I found that, I figured that was enough evidence and so I called Jack Craig from Talihina."

From this point on the testimony of Cephus Jones was substantially as that of Sheriff Craig already narrated. Jones detailed the efforts of the sheriff, the defendant and himself in searching for the hide and head of the hog. Counsel contend that part of Jones' testimony violated constitutional rights. He had said: "and as we kept on looking we split up, Jack going one way and me another direction and Velva in another direction until Jack and I met at the house. He had discovered some blood just out of that lot going toward the house, so we trailed it up to the gate and blood was still on the sidewalk just as plain as it could be, leading to the back door."

Mr. Windham: "That is objected to and ask that it be stricken. The court has ruled that it is not admissible."

We note that so far as the record shows, when the within case came on for trial, the evidence before the jury only showed that Sheriff Craig and witness Cephus Jones, in locating the place where a hog had been recently butchered and in tracing the blood signs, were in places outside the curtilage of defendant's home. Jones did not say that they entered the yard, but only that the blood signs were traced to the gate and could be seen on the sidewalk and leading to the back door of defendant's home. We do not find that the sheriff testified

to any matter determined by the court on defendant's motion to suppress to be inadmissible. The sheriff after testifying to finding hog entrails in the pasture, did testify to making circles and finally locating what he considered to be blood, and he traced it close to defendant's barn and then on to defendant's yard gate. He did not at trial say that he ever entered the barn or barn lot, if any, or defendant's yard or his home, until invited. This testimony was admitted without objection, and we cannot gather from the evidence given that the sheriff testified to searching the curtilage of defendant's residence.

In the case of Edwards v. State, 94 Okla. Cr. 11, 228 P. 2d 672, officers sitting in their car at a gas filling station where they had a right to be, on looking across the street observed a man back his automobile into the driveway of a residence and up to another car there, and then saw a known bootlegger lift the turtle-back of the car already in the yard, and saw the visitor lift the turtle-back of his car and proceed to hand the known bootlegger brown packages that looked like whiskey lugs, and the officers walked over to the fence and while on the walk and in the street observed the words "Sunny Brook" and "whiskey" on the lugs. Such evidence was by this court held admissible for the reason that the officers were at a place where they had a right to be when they discovered such facts, and such facts were held to justify the subsequent arrest and search without a warrant.

The defendant first offered the evidence of his fourteen-year old son, Richard, who testified on direct examination:

"There was some hogs come up to our house and getting in the garden and rooting up the turnips and the dogs got after one and run it into the woods, and I got the others and put them in the lot and went and called the dogs and saw they had him down and was killing him, and I got them off, and it just laid there, and I took the dogs to the house and shut them up."

Witness further testified that they had a little house where he fastened up the dogs; that at the time he put up the hogs his father was down on the creek, hunting; that he came home about an hour later and that he took him to where the hog was in the woods and his father told him to get on his bicycle and go to the home of Cephus Jones and tell him about the hogs, and that he did go to Jones' home but no one was present, and that he came on back home to wait to see if Jones would come to hunt the hogs.

On cross-examination this witness stated that his father and one Fred Mansell, a visitor, went to the woods and skinned the hog, that it was late in the evening, but not dark; that prior to this Cephus Jones came by looking for his hogs, that his father was on the creek hunting at this time, but that Fred Mansell was sitting on the porch, that his uncle Lloyd Taylor helped Cephus Jones load the hogs that had been penned up, but witness remained in the house studying his school lessons.

Velva Taylor, defendant, testified that while he was away from home his son Richard penned up some hogs. He further testified:

"When I come home Richard said, 'Daddy, some hogs are out there' and I went out and looked and he had them in the lot, and he said, 'the dogs killed one down there.' And I went and looked at it and it had its ears chewed off and was dead, and I said, 'It looks like Cephus Jones' hog, and I didn't know, and I said, 'You ought to go and see Cephus and tell him about it.' And he got on his bicycle and went up there and said no one was home, and came back and I said, 'I will go and clean it and bring it to the house—what is good', and there was about a third of it worth bringing to the house a d I 'c a th e rest of it lying there. Q. Go ahead and tell plumb on down to the time the sheriff came down there.

A. Cephus didn't show up, and the next morning I put part of the ham—cut off what they had not chewed up—in the stove to cook. Well, the sheriff he came up and Cephus was along some ten or eleven o'clock the next day, and wanted to know about a hog, and I said, 'I ain't got no hogs here', and 'Cephus loaded his hogs yesterday and taken them home', and they went to the pasture and found some entrails and came in the house. Jack had come in the house and come through there and I was over there looking around to see if I could find the head and hide, and Jack came on the back porch and hollered. I was about fifty yards from the house and had already started up there and had part of the lariat rope and a single tree, where the boys had been getting up some wash wood, and he came through the house. I had the back screen hooked and he came in the front of the house and on to the back porch, and said, 'I will have to place you under arrest', and I said, 'All right' and so he said, "I found some fresh meat in here in your ice box.' And I said, 'Well, it may be Cephus' hog. I sent word up to him yesterday to come and see if it was before I skinned it and he was not home—off at church or somewhere.' And I offered to pay Cephus for his hog, and I said, 'If that is your hog, I'll pay you for it.' I didn't want to let it lay there and go to waste, and they put me under arrest and brought me to Poteau."

It will be noted that defendant in reciting his experience with Sheriff Craig testified to the sheriff having entered his home and having discovered the fresh hog meat prior to defendant having returned to the house from the woods where the sheriff had left him. Thus the defendant by his own testimony nullified the favorable ruling suppressing all evidence by Sheriff Craig and Cephus Jones concerning the discovery of the hog meat or the search of defendant's home without a warrant prior to being invited in by the defendant after he was under arrest.

On cross-examination defendant admitted that he did not advise Sheriff Craig or Cephus Jones that he had butchered a hog or tell them where he left the head and hide until after the sheriff placed him under arrst. He claimed Craig and Jones did not ask him. He stated that he was on the creek hunting when Jones got the hogs Sunday evening that his son had penned up. Defendant further testified on cross-examination as follows:

"Q. Didn't the sheriff ask you about a hog having been killed close to your house? A. He said there had been one killed up there close to my house and didn't say whose it was or nothing. Q. You didn't tell him that you had gone up there and skinned one? A. No, not then. Q. You didn't tell him that until after he arrested you? A. Right. Q. Why didn't you tell him then? A. He didn't ask me. Q. You knew it was being investigated, didn't you? A. I figured it was. Q. Why didn't you tell them that? A. I was not under arrest and was not obligated to."

On rebuttal both Sheriff Craig and Cephus Jones testified that when they first called on defendant at his home on Monday they asked defendant if he had any knowledge of a hog being killed near his home and he disclaimed such knowledge, and went with them to hunt for the evidence of such killing.

The question is simply whether the evidence was sufficient to support the verdict of the jury. No doubt among many circumstances the jury took note of the evidence of Cephus Jones that his hogs were at defendant's place on a Saturday, but scattered into the woods, that on a Sunday about five o'clock in the afternoon he returned and obtained three of his hogs that had been penned up and called the other hog, and that Lloyd Taylor helped him call. According to Richard Taylor, the fourth hog was killed by the dogs when he put up two of the hogs, and apparently Richard had only a short time before been to Jones' home to tell him about the hog claimed to have been killed, yet when Jones showed up he remained in the house and futile calling did not cause him to

reveal anything. He kept quiet and remained inside when good faith required that he speak. His father was hunting, but later about dark he and one Mansell returned to the field or woods and butchered the hog. Why did they wait until after Jones left and until near dark? Cephus Jones had become suspicious and returned a short time after getting his three hogs and he heard two gunshots as he hunted his hog, and he soon discovered two men butchering a hog. Was the hog merely crippled by the dogs, and did the defendant finally finish the hog by shooting? Defendant admitted that he took his gun with him when he went to skin the hog. Was the hog tied and hobbled by the bloody rope found nearby? What became of the head and hide that would have shown whether the hog was shot? Why was not the defendant frank with Cephus Jones and the sheriff when they came on Monday inquiring about the hog? When the defendant returned from hunting the second time and found that Jones had just gotten the three hogs that had been penned up and discovered that his son Richard had not told Jones about the hog claimed to be already dead, and knowing that Jones was bound to be home at that time, why did he not dispatch Richard to advise Jones about the hog? And why did the defendant even after Jones and the Sheriff appeared at his place on Monday keep quiet and deny having any knowledge of a hog being butchered? Does not such fact support the conclusion that defendant had actually instructed his son to keep quiet? Defendant's own reason given on cross-examination for not being frank with Sheriff Craig and Jones was, "I was not under arrest [when they first appeared at his place] and was not obligated to." Does such answer not reasonably refute his contention that he attempted to notify Jones and pay him for his hog?

While the evidence to support the charge was what is known as circumstantial evidence, from a consideration of all the evidence, and the instructions of the court, which contain a correct instruction covering circumstantial evidence, we conclude that there was sufficient competent evidence to meet the statutory requirements. Tit. 21 O. S. 1941 § 1716.

Finally, defendant contends that the within case should be reversed because the court erred in his instructions to the jury "in that the instructions as a whole are ambiguous, contradictory and misleading to the jury as to the elements constituting the offense for which the defendant was on trial."

The instructions complained of read:

"Instruction No. 4. 'Larceny' is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof.

" 'Fraud' as applied to larceny is getting possession of property by means of deception, falsehood or artifice. The meaning of the word 'stealth' as applied to larceny, is the taking of property secretly and without the knowledge or consent of the owner."

"Instruction No. 5. Every person who steals any hog is, under the statutes of the State of Oklahoma, guilty of an offense known as Larceny of Livestock, regardless of the value of the animal stolen."

"Instruction No. 6. You are therefore instructed that if you believe and find from the evidence in this case, beyond a reasonable doubt, that the defendant, Velva Taylor, acting alone, or together with his codefendant Fred Mansell, did on or about the 2nd day of October 1949, unlawfully, wilfully, wrongfully, stealthily, fraudulently and feloniously take, steal and carry away one hog of the personal property of one Cephus Jones, without the knowledge or consent and against the will of him, the said Cephus Jones, the true owner thereof, with the unlawful, fraudulent and felonious intent then and there on the part of them, the said Velva Taylor and Fred Mansell, to deprive the said Cephus Jones of

said property and to convert the same to the use and benefit of them, the said Velva Taylor and Fred Mansell, then in that event, the defendant is guilty of larceny of livestock as charged in the information, and you should so find.

"On the other hand, [if] after a careful consideration of the case, you entertain a reasonable doubt of the guilt of the defendant of the crime charged, it will be your duty to give him the benefit of such doubt, and acquit him."

Counsel argue:

"The vice of the above instruction [4th] is that it defines larceny according to Section 1701, Title 21, O. S. 1941, whereas the defendant was being prosecuted under Section 1716, Title 21 O. S. 1941, under which it is necessary to support a conviction to prove a felonious intent on the part of the taker to deprive the owner thereof and to convert the same to his, the taker's, own use, which specific proof is not necessary to support a conviction under the general larceny statute."

It is further argued that the giving of instructions 5 and 6 did not cure the matter, and that instruction 6 conflicts with instruction 4.

Counsel relies particularly on the case of Sneed v. State, 61 Okla. Cr. 96, 65 P. 2d 1245.

In that case, while the court gave an instruction similar to Instruction No. 4 in this case, being based on the general larceny statute, Tit. 21 O. S. 1941 § 1701, it did not give an instruction covering the additional element required by Tit. 21 O. S. 1941 § 1716, heretofore quoted, and under which the within prosecution was instituted. Tit. 21 O. S. 1941 § 1701, reads: "Larceny is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof."

As stated in Sneed v. State, supra [61 Okla. Cr. 96, 65 P. 2d 1247]:

"The Legislature has modified the meaning of the word 'larceny,' as used in the Penal Code, so that the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof, is larceny, regardless of whether or not it was taken for the purpose of depriving the owner thereof or for the purpose of converting it to the use of the taker. Therefore while stealing and larceny at common law were synonymous terms, our statute has given to the word 'larceny' a much broader meaning than it then had; while 'steal' or 'stealing' has not been defined by our statutes, and must be construed according to its common-law meaning. * * *

"The only difference between the crime of stealing a domestic animal under [Tit. 21 O. S. A. § 1716] and larceny at the common law, is that this statute abolishes the degrees of the crime and makes the stealing of any of the animals named a felony, without regard to the amount of their value."

And as further pointed out in the Sneed case, Section 1716, supra, creates a separate and distinct crime from Section 1701, supra, defining larceny. And to support a conviction under Section 1716, *it is necessary to allege and prove the ownership of the animal stolen, and a felonious intent on the part of the taker to deprive the owner thereof and to convert the same to his, the taker's own* use, which specific proof is not necessary to support a conviction under the general statute, Section 1701, supra.

Thus in a case as here, there are two elements involved that are not involved in the general larceny statute, as above italicized.

In the case of McDaniels v. State, 77 Okla. Cr. 84, 139 P. 2d 191, complaint was made of the giving of a single instruction where larceny was in the first part thereof defined as in section 1701, supra, the general statute, but where further on the instruction was as to material allegations, similar to Instruction No. 6

given herein. And there counsel for defendant requested the court to give an instruction worded exactly as the requested instruction in the Sneed case, but the court refused to give the same. And while this court did not approve the instruction there given as a model instruction, nevertheless the case was affirmed. Judge Barefoot, who wrote the opinion in the McDaniels case, discussed the two above statutes, the Sneed case and a number of earlier cases by this and other courts.

We conclude that, considered together, instructions Nos. 4, 5 and 6 are harmonious, and do not conflict, and while these three instructions could have been given as one instruction and improved in wording, nevertheless, when considered together and with the other instructions given, fairly and correctly state the law applicable to the case. This is sufficient under the holdings of this court. Lamb v. State, 70 Okla. Cr. 236, 105 P. 2d 799.

If instructions 4, 5 and 6 were not satisfactory to counsel, it was their duty to have prepared and submitted in writing a more explicit instruction. Green v. State, 70 Okla. Cr. 228, 105 P. 2d 795.

The case is affirmed.

BRETT, P. J., and JONES, J., concur.